[No. 20972. In Bank.—December 22, 1893.]

THE PEOPLE, Respondent, v. B. F. GALLAGHER, Appellant.

Criminal Law—Embezzlement—Statutory Offense—Possession.—The crime of embezzlement is a statutory offense unknown to the common law, and consists of the fraudulent appropriation of property by a person to whom it has been intrusted, and may cover a case in which the personal property fraudulently converted had not been in the possession of the prosecutor.

Id.—Blank Checks Payable to Secretary of Corporation—Misappropriation of Funds.—Where a corporation had funds deposited in a bank, and its vice-president and secretary, for the purpose of paying a certain indebtedness, and not knowing the precise amount thereof, signed and delivered two blank checks payable to the secretary of the corporation, who was to fill them out in the proper amounts, draw the money thereon from the bank and pay the indebtedness, and the secretary filled up the checks with a much larger sum than that due, drew the entire amount and converted it to his own use, the money so received by him was that of the corporation, and not that of the bank, and he is guilty of embezzlement of the amount as the personal property of the corporation of which he is secretary.

Id.—Excess of Authority of Secretary—Money Received "by Virtue of Employment."—Where the secretary of a corporation receives blank checks properly signed by the corporation's officers, with authority to fill them up in amounts aggregating a certain sum, and to draw the money and pay the creditors of the corporation, but he fills them up for larger amounts than he was authorized to insert, and draws the money and converts it to his own use, he receives the money "by virtue of his employment" as agent of the corporation, and is guilty of embezzlement.

Id.—Principal and Agent—Obtaining Money in Unauthorized Manner—Fraudulent Conversion.—If an agent obtains the money of his principal in the capacity of an agent, but in a manner not authorized, and fraudulently converts the same to his own use, he receives it "in the course of his employment" as agent, and is guilty of embezzlement.

Id—Aiding and Abetting Embezzlement.—One who participates in the fraudulent misappropriation of the funds of a corporation by its secretary, under circumstances clearly indicating guilty knowledge and criminal intent, is liable as a principal co-worker in the performance of the acts constituting the corpus delicti.

Id.—Evidence—Cross-examination of Defendant.—The effect of section 1323 of the Penal Code, which provides that if a defendant in a criminal action offer himself as a witness he may be cross-examined by the prosecution "as to all matters about which he was examined in chief," is to take from the court any discretion which it might ordinarily exercise in allowing the range of a cross-examination to extend beyond the matter brought out upon direct examination, and to prevent the prose-

cution from questioning the defendant upon the case generally, and in effect making him its own witness, but does not limit or restrict the extent or character of his cross-examination as to the matters about which he was examined in chief, as upon those matters he may be cross-examined as fully as any other witness.

Id.—Extent of Cross-examination Allowed.—Where a defendant in a criminal action offers himself as a witness any question which would have the tendency to elicit from him the whole truth about any matter upon which he has been examined in chief, or which would explain or qualify or destroy the force of his direct testimony, whether it be to give the whole of a conversation or transaction of which he has given only a part, or to show by his own admissions that he has made contradictory statements, or that his conduct has been inconsistent with the statements given in his direct testimony, and thus throw discredit upon them, is legitimate cross-examination.

Id.—Restriction of Right.—The right of cross-examination affords the most effective mode of testing the accuracy or credibility of a witness, and should not be restricted beyond the requirements of the statute.

Appeal from a judgment of the Superior Court of Alameda County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*W. F. Aram*, for Appellant.

*Attorney-General W. H. H. Hart, Deputy Attorney-General William H. Layson,* and *District Attorney Charles E. Snook,* for Respondent.

The Court.—The appellant was convicted of the crime of embezzlement, and has appealed from the judgment and from an order denying his motion for a new trial.

The indictment charges that at the county of Alameda one Richard C. Beggs, a clerk, agent, and servant of the "Oakland Consolidated Street Railway Company" (a corporation), embezzled eight thousand five hundred dollars, the personal property of said company, and that the defendant, B. F. Gallagher, did aid and abet said Beggs in such embezzlement.

The first point made by appellant is that Beggs did not commit the crime of embezzlement as charged in the information. "Embezzlement is the fraudulent

appropriation of property by a person to whom it has been intrusted." (Pen. Code, sec. 503.) Section 508 of the Penal Code is in the following language: "Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant, is guilty of embezzlement." The crime of embezzlement is a statutory offense, and was unknown to the common law.

It is said that in the common law definition of larceny there were two gaps through which, in the expansion of business, many criminals escaped. The first of these gaps was caused by the rule that to sustain a charge of larceny it was necessary that the stolen goods should have been at some time in the prosecutor's possession. The second was in the assumption that when possession of goods was acquired by a bailee no subsequent fraudulent conversion constituted larceny while the bailment lasted, save in a few excepted cases. It was to meet these defects in the common law that statutes have been passed in most, if not all, of the states of our union, in some of which an offense is created known as embezzlement larceny, and in others, as in our own statute, designating the offense as embezzlement.

The case at bar relates to the remedy for the first defect mentioned in the common law, viz., a case in which the personal property alleged to have been fraudulently converted had not been in the prosecutor's possession.

These preliminary remarks, with a view to the better understanding of the initial points in the case, and we proceed to a review of the contention of appellant, the underlying theory of which is that the money alleged to have been embezzled did not come into the control or care of Beggs *by virtue of his employment as a clerk, agent, or servant.* The uncontradicted evidence was to the effect that the Oakland Consolidated Street

Railway Company (a corporation) was doing business at Oakland, in the county of Alameda, was indebted to two companies in several sums of money aggregating, say $2,500; that Richard C. Beggs was secretary of the corporation, and as such secretary his duties were, among other things, to keep the books of the company, to receive all the coin due the company and deposit it (except small sums kept to pay off discharged workmen) in the First National Bank of the city of Oakland; to draw and sign checks as secretary, which checks were also to be signed by the president or vice-president; that the corporation had in the bank aforesaid some $8,000 to $10,000 and credit for an overdraft of $10,000; that on or about June 3, 1892, J. E. McElrath, vice-president of the corporation, for the purpose of paying off the indebtedness of the corporation to the two companies aforesaid, and not knowing the precise amount thereof, signed and delivered to Beggs two checks payable to his, Beggs', order on said bank, leaving the amount to be paid thereon and on each of them in blank.

The evidence is contradictory as to whether Beggs was to indorse the checks and deliver them to the creditors or to draw the money thereon from the bank and pay them. As there was evidence to that effect, we must in favor of the verdict assume the latter theory to have met the approbation of the jury. On the sixth day of July, 1892, Beggs filled up the checks, one for $4,000, and the other for $4,519.20, signed them as secretary, drew the full amount thereof, aggregating $8,519.20 from the First National Bank, converted $1,300 thereof into currency, left $2,500 with his wife, and fled with the residue to the northern part of the state, where he was arrested two or three days later, and thereupon confessed his guilt.

The connection of defendant with the transaction is not here mentioned, for the reason that the contention under this head relates only to the receipt of the money by Beggs in the course of his employment. The argu-

ment that the money received by Beggs was that of the bank and not that of his corporate employers cannot be maintained. The corporation had funds in the bank. The checks were duly signed by the authorized officer of the corporation and countersigned by Beggs, its secretary.

Under such circumstances it was not only the privilege but the duty of the bank to pay the checks to Beggs, who was the payee and holder thereof, upon presentation, and when paid the amount of payment was a proper charge against the corporation. This being so, the money when received by Beggs was as much the property of the corporation as though collected by the former for it upon a lawful account against any other debtor of the corporation. It is further urged that Beggs had no authority to draw the money from the bank, and hence it did not "come into his control or care by virtue of his employment," within the purview of the statute. The earlier English authorities are not uniform in this proposition. In *Rex* v. *Snowley*, 4 Car. & P. 390, the prisoner was hired to perform certain services, and was authorized to receive not less than twenty shillings in each case; in a single instance he charged only six shillings, which he received and did not account for. Held, that there was no embezzlement of the six shillings, inasmuch as it was his duty to take no sum less than twenty shillings, and therefore the six shillings were not received by the prisoner in the course of his employment. There are other English cases of like import, while perhaps an equal number of cases in the same courts hold a contrary doctrine. Bishop, in his work on Criminal Law, in commenting upon *Rex* v. *Snowley*, 4 Car. & P. 390, uses the following language: "That in reason, whenever a man claims to be a servant while getting into his possession by force of this *claim* the property to be embezzled, he should be held to be such on his trial for the embezzlement. Why should not the rule of estoppel known throughout the entire civil department of our jurisdiction apply in the criminal? If

it is applied here, then it settles the question; for by it, when a man has received a thing from another under a claim of agency, he cannot turn round and tell the principal asking for the thing, ' Sir, I was not your agent in taking it, but a deceiver and a scoundrel.'" (Bishop on Criminal Law, 3d ed., sec. 367.) In the 7th edition of the same work, like language, with some additions, is used at section 364 of volume 2.

In *Ex parte Hedley*, 31 Cal. 109, a case involving the same question, and in many respects similar to the one at bar, this court quoted, with marked approval, the foregoing extract from Bishop, and in an opinion regarded as conclusive of the question here held that if an agent obtains the money of his principal in the capacity of agent, but in a manner not authorized, and converts the same to his own use, with intent, etc., it is money received " in the course of his employment" as agent.

The evidence shows that it was within the course of the employment of Beggs to draw, upon like checks with those in question, the money of the corporation from bank and to pay its debts. In the present instance he held the two checks with authority to fill them up in amounts aggregating about $2,500, and, according to his evidence, to draw the money and pay the creditors of the corporation, or, according to the evidence of the vice-president to indorse and deliver them to the creditors. It was as the secretary, and in the course of his employment as such, that he received the checks and filled them up, but in a manner different from his instructions, in that he filled them for larger amounts than he was authorized. Under such circumstances he comes within the rule laid down by Bishop, as interpreted in *Ex parte Hedley*, 31 Cal. 108.

Appellant further insists that there is no evidence whatever that defendant aided and abetted in the appropriation and conversion of the money. In the light of the testimony this claim seems somewhat extraordinary. There was testimony tending to show that by

previous appointment defendant repaired to a saloon in the vicinity of the bank while Beggs procured the money; that they immediately met and came to San Francisco with the funds, procured a private room at the Lick House, where defendant registered under a fictitious name, that he procured currency for $1,300 of the coin, took all of the funds except $2,500 in a valise to the Oakland station, procured tickets for himself and Beggs to Sacramento, paying therefor from the appropriated fund, had access to and carried the money at least a portion of the time, and when arrested had $50 or $60 of the money on his person, coupled with the fact that they did not pursue the usual course of travelers in procuring through tickets to their destination, but only for short distances, and in various ways acted unlike men with money in hand honestly acquired, intent upon a journey, taken in connection with the statements of defendant when arrested and subsequently, lead irrestibly to the conclusion that the two men were *particeps criminis*. Waiving, therefore, the evidence that it was the defendant, who previous to the commission of the crime had "advised and encouraged" it, and we think the evidence against defendant was ample to warrant a conviction.

The very fact that the embezzlement was determined upon before the money was drawn from the bank detracts nothing from the guilt of defendant as an aider and abettor under such circumstances. Mere intention to commit a crime does not constitute an offense. Had Beggs, after procuring the money from the bank, honestly appropriated it to the legitimate uses of his employer, then, although the amount was in excess of the sum he was authorized to draw, his offense would have been incomplete. It was the subsequent wrongful appropriation of the funds that constituted the crime, and in this the defendant participated under circumstances clearly indicating guilty knowledge and criminal intent. He was not simply an accessory after the fact, but a co-

worker in the performance of the acts constituting the *corpus delicti.*

The defendant offered himself as a witness in his own behalf, and testified that he was not sure whether he saw Beggs on the Saturday next before the 6th of June or not, but that on the following Sunday he did see him; that he met him about one or two o'clock on that day, and was with him until eleven o'clock in the evening; that when they separated that night they made an appointment to meet on the following day, Monday, June 6, 1892, between eleven and twelve o'clock in the morning, at a certain saloon in Oakland across the street from the First National Bank; that there was nothing said about Beggs drawing money from the bank, and that there was no particular purpose for which they were to meet. He also testified: "I did not on this Saturday just referred to, or at any other time, or ever, advise him to take the funds of the bank or corporation of which he was secretary and appropriate them to his own use; nor did I then or ever suggest to him that he might do that, or that he and I might do that, or that we might go to Canada or to some place, or that we would divide the funds equally after we got away. I did not ever at any time advise him to draw this money from the bank and go off with it; nor did he ever suggest doing so and I consent to it; nor did I ever agree with him to go off with the money of the bank or of the corporation on deposit in the bank."

Upon his cross-examination he was asked:

"Q. Did not you and Beggs, at or previous to the time you met in the saloon, on the sixth day of June, 1892, agree to take this $8,500 which Beggs had drawn out of the bank, and go to San Francisco?

"A. No, sir.

"Q. Did you not further agree that you should take this money to San Francisco and change it into currency?

"A. No, sir.

"Q. And did you not agree that after the money was

changed into currency you should take the train which goes at seven o'clock towards Portland, Oregon, and take the money with you, and go to Sacramento?

"A. He spoke about going to Sacramento on the seven o'clock train.

"Q. I am asking you if you did not agree with him to do that before one o'clock of June 6th?

"A. We agreed to go to Sacramento, yes, but did not agree to take the money."

·The counsel for the prosecution then asked the following questions:

"Q. I will now ask if you did not go to San Francisco with Mr. Beggs on Monday afternoon, Monday, the sixth day of June, 1892, and take with you $8,500 which Mr. Beggs had drawn from the First National Bank of the city of Oakland, belonging to the First Oakland Consolidated Street Railway Company?" to which the witness answered "Yes."

"Q. Did you not, when you arrived in San Francisco, assist Mr. Beggs in changing about $1,300 of that money into currency?

"A. I changed $1,300 of that money into currency, I did not do so in order to make it easier for Mr. Beggs and myself to flee with this money.

"Q. Did you not return to Oakland, bring back this same money with Mr. Beggs, and leave Mr. Beggs somewhere near Oakland Point, and you go to the Sixteenth Street station, taking with you $6,000 of this money?

"A. We returned to Oakland, and I went to Sixteenth Street station with the money *at Beggs' dictation.*"

These last three questions were objected to by the defendant's counsel upon the ground that they were not proper cross-examination, not having reference to any matter testified to by the witness in his examination in chief. The court overruled the objection, and, upon the witness declining to answer the questions on the further ground that the answers would tend to criminate him, the court peremptorily ordered him to answer, and

thereupon the above answers were given. These rulings of the court were properly excepted to, and are now assigned as error.

We are of the opinion that the court did not err in overruling the objections. Section 1323 of the Penal Code provides: " A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offer himself as a witness he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief." The effect of the latter clause of the above is to take from the court any discretion which it might ordinarily exercise in allowing the range of a cross-examination to extend beyond the matter brought out upon the direct examination. (See *People* v. *Rozelle,* 78 Cal. 84.) And to prevent the prosecution from questioning the defendant upon the case generally, and in effect making him its own witness. (*People* v. *O'Brien,* 66 Cal. 602.) The statute does not, however, place any limitation or restriction upon the extent or character of his cross-examination " as to all matters about which he was examined in chief;" and upon those matters he may be cross-examined as fully as any other witness. Any question which would have the tendency to elicit from him the whole truth about any matter upon which he had been examined in chief, or which would explain, or qualify, or destroy the force of his direct testimony, whether it be to give the whole of a conversation or transaction of which he had given only a part, or to show by his own admissions that he had made contrary statements, or that his conduct had been inconsistent with the statements given in his direct testimony, and thus throw discredit upon them, would be legitimate cross-examination.

The " matter" about which the defendant had been examined in chief was whether he had co-operated or acted in concert with Beggs in appropriating to his own use and converting the money in question; and although he had stated in categorical terms that he had not done

so, his answers were not conclusive in his favor, nor did they prevent the prosecution from showing through the medium of a cross-examination that they were false, and for this purpose the prosecution was not limited to a repetition of the questions propounded upon the direct examination, or to asking him whether his answers to those questions were correct or not. Neither was the right of cross-examination limited to the mere questions that his counsel had asked him upon the direct examination, or to the replies which he had made to those questions, but it extended to the entire matter "about" which he had been examined in his own behalf, viz., whether he had given to Beggs any advice, or suggestion, or aid in appropriating the money. By offering himself as a witness he waived all objection to his constitutional right to claim exemption from giving testimony against himself upon all the matters about which he should volunteer to testify, and as to those matters he opened the door for the most searching investigation by cross-examination as to the accuracy of his testimony as fully as any other witness who might have given the same testimony. The right of cross-examination affords the most effective mode of testing the accuracy or credibility of a witness, and should not be restricted beyond the requirements of the statute. It was not the intention of the legislature to give to a defendant the opportunity of making any statement upon his direct examination which he might choose, in reference to the issue before the court, and to preclude the prosecution from showing out of his own mouth that such statement is false.

In *People* v. *Rozelle,* 78 Cal. 84, it was held that the defendant might be cross-examined upon a letter which he had written, and about which no questions had been asked him upon the direct examination, upon the theory that the letter tended to contradict the denials which he had made on his direct examination. The statute of Missouri authorizing the defendant to be a witness in his own behalf contains a restriction upon his cross-ex-

amination in the same language as our own. In *State
v. McKinzie*, 102 Mo. 620, there had been evidence on
the part of the prosecution tending to show that the de-
fendant had provoked a controversy by striking the de-
ceased with a cane, and the defendant offered himself
as a witness, and testified in his own behalf that he had
no cane with him at the time of the killing, nor did he
strike the deceased with a cane. Upon his cross-exam-
ination he was asked whether he did not have a cane
with him in a certain saloon which he and the deceased
had left a short time before the killing. This question
was objected to upon the ground that the defendant had
only been questioned about what occurred after he left
the saloon, and that he could not be questioned as to
what had occurred prior thereto; but the court held that
the question was proper cross-examination, upon the
ground that he had been asked about having a cane
with him and using it in the homicide, and that his
possession and use of the cane were the matters referred
to in the examination in chief, and that he might be
cross-examined fully with reference to such possession
and use.

The testimony of the defendant that he had been with
Beggs during the greater portion of the preceding day
and until a late hour in the night, and that they had
parted with an agreement to meet in a saloon across the
street from the bank between eleven and twelve o'clock
on the next day without any particular purpose for so
meeting, taken in connection with his testimony that
that they had agreed to go to Sacramento by the seven
o'clock train, made the questions proper cross-examina-
tion for the purpose of throwing discredit upon the ac-
curacy of his statements that they did not also agree to
take the money with them, and that he had never ad-
vised Beggs to take the funds of the corporation of which
he was the secretary and had never agreed with him to
go off with the money, or consented to his doing so. If
the defendant and Beggs did, in fact, on the 6th of June,
after they had met at the saloon according to their pre-

vious appointment, go to San Francisco together, with this money, and after their arrival there the defendant changed a portion of it into currency and thereafter returned to Oakland and went to the Sixteenth Street station with this same money where he met Beggs, and they thereafter took tickets and went to Sacramento taking this money with them, these facts would tend to show concerted action and a prior agreement between them to do the acts. For this purpose it was proper to permit the prosecution to show these facts by the cross-examination of the defendant.

We find no error in the record, and the judgment and order are affirmed.