[Crim. No. 59.   Third Appellate District.—April 15, 1908.]

## THE PEOPLE, Respondent, v. RICHARD B. MAUGHS, Appellant.

CRIMINAL LAW—IMPANELMENT OF JURY—QUALIFICATIONS OF JURORS—
EXPRESSION OF OPINION FOUNDED ON PUBLISHED STATEMENTS.—In
the impanelment of a jury in a criminal case, the formation and
expression of an opinion, founded on public rumor, statements in
public journals or common notoriety, do not disqualify a juror from
serving on the jury, if it appears to the court, upon his *voir dire,*
that he could and would try the case fairly and impartially, regard-
less of such opinion, and return a verdict in accordance with the
evidence adduced and the instructions of the court.

ID.—PROVINCE OF TRIAL COURT.—It is the province of the trial court,
even where the answers of the juror are conflicting as to his quali-
fications, to decide whether he is qualified, and a finding thereon
cannot be disturbed by the reviewing court, unless it can be
truthfully said that the testimony shows on its face that, as matter
of law, the court erred in its ruling.

ID.—ERROR IN DENYING CHALLENGE FOR ACTUAL BIAS—PEREMPTORY
CHALLENGES NOT EXHAUSTED.—Even though errors should appear
in disallowing challenges for actual bias, the defendant has no
ground of complaint if he has not exhausted his peremptory chal-
lenges.

ID.—PRESUMPTION UPON APPEAL.—In the absence of a showing in the
record whether or not the defendant had exhausted his peremptory
challenges, it being his duty to show prejudicial error affirmatively,
it must be presumed that he was not prejudiced by the disallowance
of his challenge for actual bias.

ID.—MURDER—PLEAS OF "FORMER ACQUITTAL" AND "ONCE IN JEO-
PARDY"—ERROR OF CLERK WITHOUT PREJUDICE.—Although the clerk
erred in not stating to the jury pleas of "former acquittal" and
"once in jeopardy," set up by the defendant, yet such error is

not prejudicial, where the record shows no attempt to introduce any evidence in support of either of those pleas.

ID.—ORDER FOR CONTROL OF JURORS BY SHERIFF BEFORE COMPLETION OF PANEL—SEPARATION.—Where the jurors sworn pending the completion of the panel were ordered into the custody of the sheriff, "while retiring," and it was not intended by the court nor understood by defendant and his attorneys that the order was made under section 1121 of the Penal Code, and it was applied by their consent to custody during the noon recess only, and was so applied by consent after the panel was completed, and there was no separation under the order as thus interpreted, the order is not reversible error, and a temporary separation of the jurors under that order at other times is not reversible error, when it appears that an order made at the close of the trial for the custody of the whole jury, under that section, was fully obeyed.

ID.—TESTIMONY OF DEFENDANT AS TO SELF-DEFENSE—SCOPE OF CROSS-EXAMINATION.—Where the defendant as a witness testified only to facts constituting self-defense in the commission of the homicide, such testimony involved the whole case, and the prosecution were entitled to cross-examine him as to all the circumstances leading up to, and connected with, the homicide.

ID.—EVIDENCE—CRIPPLED CONDITION OF DECEASED—REBUTTAL—ORDER OF PROOF.—Testimony to show the crippled condition of the left arm of the deceased, in the trend of which defendant testified that he advanced upon him with a knife, when he shot him, was clearly admissible in rebuttal; but the production of such evidence out of its proper order would not warrant a reversal of the case.

ID.—CORPUS DELICTI—DECLARATIONS—ORDER OF PROOF—DISCRETION.—Although ordinarily proof of the *corpus delicti* should precede proof of the declarations or admission of the defendant, yet the order of proof being in the sound discretion of the court, and it appearing that the *corpus delicti* was fully proved, after the declarations were proved, it is evident that defendant was not prejudiced by the change in the order of proof.

ID.—MODEL OF PORCH WHERE SHOOTING OCCURRED—EXPLANATION OF EVIDENCE—HINDRANCES TO VIEW.—A correct model of the porch where the shooting occurred conceded as not representing hindrance to view by growing vines about the trellis-work or otherwise, but faithfully representing the porch itself, was properly received for the purpose of illustrating the testimony of witnesses as to the place of the shooting, where the conditions surrounding and obstructing the view were fully explained by witnesses.

ID.—INSTRUCTIONS.—*Held,* that the instructions given by the court were full, fair and pertinent to all of the material issues presented by the information and the evidence; and that instructions offered by the defendant and refused were, where applicable to any im-

portant issue, fairly presented in the charges; and that no prejudicial error appears on the refusal of requested instructions.

ID.—INSTRUCTION AS TO FLIGHT.—Although the defendant finally surrendered himself voluntarily, yet where there was evidence that the accused was seen on horseback after the homicide, to which he referred, and stated that he wanted to see his father and get money with which to leave the country, an instruction as to flight was appropriate, and not presumed prejudicial.

ID.—INSTRUCTION AS TO COMMONPLACE—AMBIGUITY REMOVED.—An instruction based on subdivision 2 of section 2061 of the Code of Civil Procedure involves mere matter of commonplace, and when an ambiguity therein is clearly stated in the latter part of the instruction, no prejudicial error appears. It ought not to be necessary to tell a jury of average intelligence, under that section, that they need not accept the testimony of any number of witnesses if it does not convince them of the truth of the fact to which it relates.

ID.—INSTRUCTION AS TO MATTER OF BELIEF, INFERENCES, ETC.—*Held*, that though a requested instruction under section 1845 of the Code of Civil Procedure, that the jury must disregard any part of the testimony of a witness which involves only his "belief, or his inferences, or his impressions, or his deductions," might have well enough been given, the defendant was not prejudiced by its refusal.

APPEAL from a judgment of the Superior Court of Merced County, and from an order denying a new trial. E. N. Rector, Judge.

The facts are stated in the opinion of the court.

J. W. Knox, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HART, J.—The jury returned a verdict against the appellant of murder of the first degree, and, in the exercise of the discretion conferred upon it by section 190 of the Penal Code, fixed the penalty at imprisonment for life.

After the presentation and denial of a motion for a new trial, the defendant was, in accordance with the terms of said verdict, sentenced by the court to imprisonment in the state penitentiary for the term of his natural life.

This appeal is from the judgment and the order refusing defendant a new trial.

The crime of which appellant was convicted grew out of the killing by him of one Charles Zander by means of a pistol or revolver.

This is the second trial of the cause, the first having resulted in the conviction of the defendant of murder of the first degree and the imposition of a judgment involving the death penalty, but the judgment and order therein were reversed upon appeal to the supreme court and the cause remanded for a new trial. (*People* v. *Maughs,* 149 Cal. 255, [86 Pac. 187].)

The defendant, for some time prior to the homicide, had been in the service, as a sort of general "utility man," of the deceased and one B. E. Cole, on a "ranch" in Merced county, not far from the line dividing said county and San Benito county, which the latter were working as copartners. The duties of the defendant (who at the time of the homicide was between fifty-five and sixty years of age) were to look after and care for the chickens, keep the fences inclosing the ranch in repair, cook the meals, and, in short, to perform all such other service as ordinarily come within the duties of a domestic servant.

Cole and Zander, during the morning hours of the day upon which the killing occurred, had been going over the ranch, repairing fences which had been through some cause broken down. While the partners were so engaged, a neighbor came along, and, addressing them, said that he had informed Maughs "about that break" in the fence two or three days before. This seemed to enrage Zander, who referred to Maughs in opprobrious language. Near the noon hour the deceased and Cole returned to the house. After they put their horses in the stable, Zander hastened, apparently in a state of anger, to the house, Cole remaining in a vacant lot near the barn. Zander, upon reaching the interior of the house, proceeded to chide Maughs for neglect in repairing the fence and for not getting "the cattle out of the horse corral." The defendant's version of what occurred in the house is to the effect that Zander called him (defendant) vile names, threatened to do him personal violence, and then started to leave the house in a state of intense anger and excitement, but had gone only a short distance when he turned around and ordered Maughs to "roll his blankets" and "get off this ranch," to which latter suggestion defendant replied, "All

right, I can do that." The defendant testified that, being apprehensive that the deceased, who was young, strong, robust and active, might attempt to injure him, he went into a room where several different kinds of weapons were kept, and placed his own pistol in his pocket. Thereafter, Zander returned to the house by way of the back porch and the defendant was then in the act of stepping out of the kitchen on to said porch, when the deceased renewed the quarrel, repeatedly addressing the defendant as a "son-of-a-bitch," and applying to him other like epithets. The defendant declares that the deceased held an open knife in his hand at this time, and after threatening the defendant rushed toward the latter with his left hand, holding the knife, upraised, as if he were going to make an assault, whereupon the defendant drew his revolver and fired at Zander, "without taking aim," the ball entering the head and into the brain, and necessarily producing a mortal wound.

When the shooting occurred Cole and a man named Gallagher were sitting on a wagon tongue something over one hundred feet from where the deceased and the defendant were quarreling and from where the fatal shot was fired. A portion of that side of the porch, to the right of which Cole and Gallagher were sitting, was inclosed with trellis-work, over and about which a thick vine, extending from the ground to the top of the porch, had grown. There were also between the point at which Cole and Gallagher were sitting and the porch on which the shooting took place two chicken fences, about six feet high, made of pickets set together closely.

Gallagher testified that, while he heard the voices of the deceased and the defendant just prior to hearing the shot, he paid no attention to what they were saying, and he could therefore give none of the language or words used by them. Cole testified that he was interested in the quarrel and could hear distinctly what was said. He testified that he saw Zander go to the pump located on the back porch; that he judged from Zander's voice that he was very angry; that he heard Maughs go into the kitchen from the sitting-room, and before he got to the door he said he was "getting damn tired of this noise"; that he had heard enough of it, "and he says, 'Let this be your last word,' and shot, and the witness stated that immediately following the shot he heard Zander "hit the floor," by which he meant that he heard the sound made by

the falling of deceased's body upon and striking the floor. Cole claimed that he could see a part of the person of Zander when the latter was on the back porch and the shot was fired.

The facts thus narrated are gleaned, it is to be observed, from the testimony of the two principal witnesses—Cole for the people and the defendant in his own behalf.

There is no serious claim that the evidence is insufficient to justify the verdict. It is, however, contended that there are many errors in the record, any one of which is of sufficient force and importance to entitle the defendant to a new trial. These alleged errors are involved in the rulings of the court upon questions of the admissibility of testimony and in the giving and rejection and modification of instructions.

1. Appellant insists that the court erred in its rulings disallowing challenges to jurors Hardman and Phenegar on the grounds of actual bias. Each of these jurors, it clearly appears from the record, declared that he had read in the local newspaper accounts of the homicide and of the verdict of the coroner's jury finding that the crime of murder had been committed, and had also heard the case discussed by neighbors and acquaintances, and from these had formed an opinion upon the question of the guilt or innocence of the defendant. Each stated that, notwithstanding the opinion thus formed, he could and would try the case fairly and impartially, and regardless of such opinion, and return a verdict in accordance with the evidence adduced at the trial and the instructions of the court. It does not appear from the examination of these jurors that either ever discussed the case with anyone claiming to know the facts or with any of the witnesses who testified at the trial. The rule of law in this state—so well and generally understood that it is even familiar to laymen—is that the formation and expression of an opinion upon a matter to be submitted to a jury, founded upon public rumor, statements in public journals, or common notoriety, do not disqualify a person from serving upon such jury, if it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly in the trial and determination of the questions submitted to him. (Pen. Code, sec. 1076.) And even where the answers of a juror upon his *voir dire* involve conflicting statements bearing upon the ques-

tion of his qualification to serve, it is with the trial court to decide whether he is qualified, and its finding thereon, whatever it may be, cannot be disturbed by a reviewing court, unless it can truthfully be said that the testimony thus adduced upon its face shows that, as a matter of law, the court erred in its ruling. (*People* v. *Fredericks,* 106 Cal. 559, [39 Pac. 944]; *People* v. *Ochoa,* 142 Cal. 274, [75 Pac. 847]; *People* v. *Flannelly,* 128 Cal. 86, [60 Pac. 670]; *People* v. *Evans,* 124 Cal. 210, [56 Pac. 1024]; *People* v. *Owens,* 123 Cal. 487, [56 Pac. 251]; *People* v. *Scott,* 123 Cal. 435, [56 Pac. 102].) But, as a matter of fact, there is no conflict in the statements of the jurors in the case at bar. They each admitted entertaining the opinion, formed from what they had read and heard, that the defendant was guilty of the crime charged against him. This opinion having been founded on newspaper reports and common notoriety and public rumor, and each juror having declared that, notwithstanding such opinion, he could try the issues submitted to him impartially and fairly, neither was shown to be disqualified under the law. If the mere fact of forming and expressing an opinion thus founded would, *per se,* disqualify a citizen from serving as a juror in a criminal case, then, indeed, the trial and punishment of persons accused of crime would, under our system, be at an end, for it must be true that every person of ordinary intelligence necessarily forms an opinion of some kind upon every subject concerning which he has read accounts in the public journals or about which he has had discussions with other people. But, aside from these considerations, it is to be noted that it does not affirmatively appear from the record that the appellant had exhausted all the peremptory challenges which he was entitled to exercise, and we think it is well settled that even where the court errs in denying a challenge for actual bias, and the defendant has not exercised all his peremptory challenges upon the completion of the panel, the error of the court in disallowing the challenge cannot be made available either upon a motion for a new trial or on appeal to the advantage of appellant. The reason of this rule is, obviously, that the defendant has no ground for complaint when he has it in his power to remove the objectionable juror by other means than those he had unsuccessfully attempted to invoke. So, even if it could be said

8 Cal. App.—8

that the court erred in disallowing these challenges, the appellant has thus failed to affirmatively show through the record here, as it was his duty to do if he could, that he was prejudiced thereby, for there can be indulged by this court no presumption, in the absence of a showing in the record to the contrary, that the defendant exhausted all his peremptory challenges.

2. It seems that, upon his arraignment, the defendant, in addition to entering a plea of "not guilty" to the charge alleged in the information, also interposed the pleas of "former acquittal" and "once in jeopardy," and that at the trial the clerk of the court, upon reading the information to the jury, stated to the latter that the defendant had entered a plea of "not guilty" to the information, but omitted to state that the special pleas mentioned had been also interposed. After a number of witnesses had given testimony for the prosecution, and before the people closed their original case, the district attorney called the attention of the court to the omission by the clerk to state to the jury said special pleas. Thereupon the court, against the objection of counsel for appellant, directed the clerk to state to the jury all the pleas interposed by the defendant. It was undoubtedly the duty of the clerk to have stated to the jury all the pleas of the defendant to the crime charged against him in the information before any evidence was received (Pen. Code, sec. 1093, subd. 1), and failure to do so was error. But the record before us discloses that such omission here did not constitute prejudicial error. There is not the slightest proof in the record addressed to the issues tendered by the special pleas; nor was there any attempt to introduce proof in support of such pleas. Under these circumstances, the defendant could not, of course, have been prejudiced by the oversight.

3. It is complained that the appellant suffered serious harm by the separation of the jury during the progress of the trial after it had been ordered by the court into the custody of the sheriff, the claim being that such order was made under the authority of section 1121 of the Penal Code. The record shows that before the panel was completed—that is, before twelve jurors had been sworn to try the case—the court made an order, to which counsel for defendant objected, that the sheriff take charge of the jury. After some colloquy between

court and counsel relating to said order, the former inquired
of the latter: ''Do you consent that the order be made tem-
porary?'' to which Mr. Bogie, of counsel for defendant, re-
plied: ''Yes, we consent, the defendant consents that it will
be just temporary, they are in the custody of the sheriff while
retiring.'' While it is not clear what counsel exactly meant
by the use of the language, ''they are in the custody of the
sheriff while retiring,'' we think it is clear from the record
that it was not intended by the court, nor so understood by
the defendant and his attorneys, that the order made was the
one authorized and contemplated by section 1121 of the Penal
Code. It is evident that the court had some reason, the na-
ture of which the record does not disclose, for keeping to-
gether and consequently in the custody of the sheriff pending
the completion of the panel, such jurors as had been selected
and accepted by both sides before the panel had been com-
pleted, and also after the jury was completed, that they re-
main in the custody of that officer during the noon recesses
only. The defendant not only expressly consented to this
course, but even suggested it. We do not feel compelled to
decide the question of whether, after the court, in the exer-
cise of its discretion, under section 1121 of the Penal Code,
has ordered the jury into the custody of the sheriff, the de-
fendant, by consenting to a separation of the jurors, could
be held, as a matter of law, to have thus waived the right to
thereafter complain of such separation. But the record here
does not make it appear very clear precisely to what extent
the order was executed. So far as we are able to determine
from the record, the court, as we have suggested, does not
appear to have attempted to exercise the discretion conferred
upon it by section 1121, *supra,* but when the order was first
made, seems only to have intended, for some reason which
apparently appealed as well to the counsel for the defendant,
that the order should have force temporarily and until the
whole panel had been selected and sworn. It further appears
that after all the evidence was received and before the argu-
ment began the court took a recess until the usual hour of
opening the afternoon session, and at that time ordered the
jury in charge of the sheriff. It does not appear that they
were permitted to separate after that order was made. In
the case of the *People* v. *Maughs,* 149 Cal. 255, [86 Pac. 187],
it is held that where the court directs the sheriff to take

charge of the jury under the power to make such an order conferred upon it by the section of the Penal Code referred to, and thereafter the jurors are permitted to separate, such separation in and of itself constitutes error, but it is not expressly declared therein to be such error as demands a reversal. But we do not think the case here, as to the point we are discussing, comes clearly within the rule as declared in that case. In any event, we do not think the action of the court in this particular justifies a reversal.

We cannot refrain from here remarking that it is very evident that the attorneys for the people and the learned judge of the trial court either did not before or during the trial of the present case read the opinion of the supreme court reversing the first trial hereof, or, if they did, paid little heed to what the court has to say, in language as clear as crystal, upon the subject now under consideration. If they had read the opinion even hastily it would at least seem as if no such chances for a reversal of the present appeal would have been taken as are apparent from the slip-shod course pursued with reference to the order directing the sheriff to take charge of the jury. It is often the case, perhaps, that trial judges have little time to read the opinions of the higher courts, and do not do so until such cases are cited upon some particular question pending before them. But practicing lawyers are supposed to watch the reported cases, particularly where they dispose of questions with which they have to deal in some impending trial. It was, therefore, the duty of the state's attorneys in the case at bar to have called the attention of the court to the remarks of the supreme court in this same case, relative to the exercise of the power by the court vested in it by section 1121 of the Penal Code. District attorneys should also remember that, while zeal is a very excellent quality in a prosecuting officer, it, perforce, becomes a menace rather than an advantage to a successful prosecution of a criminal case when it succeeds in usurping the place of sound and sane judgment. With the opinion in the Maughs case before them, the prosecuting attorneys and the court can suggest no conceivable excuse for the occasion of the present discussion in this case, and but for the fact that we do not consider the action of the court in this respect, under the circumstances as disclosed by the record, prejudicial to the

rights of the appellant, we would not hesitate to order a reversal for this very reason.

4. The contention that too much latitude was allowed in the cross-examination of the defendant is, we think, devoid of merit. After answering a few preliminary questions, the defendant was asked the following question by his attorney: "Now, take at the very instant the fatal shot was fired, why did you shoot Charlie Zander?" The defendant replied: "Well, he came at me with a knife and said he would cut my damned throat, and I thought he would ·do me some great bodily harm or ·kill me, and I fired at him to keep him from killing me." At the conclusion of this answer, the defendant was turned over to the prosecution for cross-examination. It was no doubt the assumption of counsel for the defendant that such brevity in the examination in chief would curtail the cross-examination or prevent an inquiry through cross-examination into all the circumstances immediately attending the homicide. Objection was, therefore, made to nearly every question propounded to the defendant by the district attorney, and the rulings of the court disallowing certain objections made to the extended cross-examination by the people are assigned as error.

We think the questions asked the defendant by the district attorney were well within the sphere of legitimate cross-examination.

Section 1323 of the Penal Code provides, as does also section 13 of article I of the constitution, that a defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but the code section mentioned also provides that if a defendant in such an action or proceeding "offers himself as a witness, he may be cross-examined by the counsel for the people as to *all matters about which he was examined in chief*." The cross-examination of the defendant in the case at bar involved an inquiry into all the pertinent circumstances immediately leading up to and connected with the act of killing. This course, as we have stated, was allowable under the section of the code to which we have referred as interpreted by the supreme court in many cases. (*People* v. *Rozelle*, 78 Cal. 91, [20 Pac. 36]; *People* v. *Mullings*, 83 Cal. 138, [17 Am. St. Rep. 223, 23 Pac. 229]; *People* v. *Gallagher*, 100 Cal. 475, [35 Pac. 80]; *People* v. *Soeder*, 150 Cal. 12, [87 Pac. 1016].) In *People* v. *Rozelle*, 78 Cal. 91, [20 Pac.

36], the court says: "The impression seems to prevail that the section quoted (1323, Pen. Code) has the effect to confine the examination of a defendant to narrower limits than in the case of any other witness. He can only be cross-examined as to matters about which he was examined in chief. The rule is precisely the same as, to any other witness." In *People* v. *Gallagher*, 100 Cal. 475, [35 Pac. 80], it is said: "Any question which would have the tendency to elicit from him (defendant) the whole truth about any matter upon which he had been examined in chief, or which would explain, or qualify, or destroy the force of his direct testimony, whether it be to give the whole of a conversation or transaction of which he had given only a part, or to show by his own admissions that he had made contrary statements, or that his conduct had been inconsistent with the statements given in his direct testimony, and thus throw discredit upon them, would be legitimate cross-examination."

The defendant admitted killing Zander, but claimed that the act was in necessary self-defense. On his examination in chief he declared that the act was committed in the defense of his person and life. This statement by the defendant was a mere bald statement, unaccompanied by a recital of any of the circumstances under which the homicide occurred, that the act was necessary for the protection of his own person or for the preservation of his own life. In fact, the answer amounted only to a conclusion drawn by the defendant from the circumstances of the homicide as he claimed to view and understand them. The people had a right to learn, if they could, by a cross-examination of the defendant, whether he had formed a correct conception of the circumstances under which he took the life of Zander. They were entitled to an opportunity to ascertain, through cross-examination of the accused, whether or not his statement carried with it the truth by inquiring into all the circumstances of the "matter about which he had testified." And we have been unable to find any question thus propounded to him and to which objection was made involving an inquiry into any other matter than that "about which he had testified in chief." His answer to the single question asked on direct examination involved his whole case—his complete defense—and therefore opened up for full and thorough exploration by the people the en-

tire field of legitimate inquiry into all the circumstances of the homicide.

5. The court did not err in permitting, over the objection of appellant, certain witnesses to give testimony in the people's original case concerning the alleged crippled condition of the left arm of the deceased. The claim is that the testimony was admissible only as rebuttal, and in that case only upon the interposition by the defendant of the defense of self-defense. The order of proof is largely in the discretion of the trial court. (Pen. Code, sec. 1094.) But we are not sure but that the testimony was properly admitted in the prosecution's chief case, for prior to the reception of this evidence, the declarations of the defendant immediately after the homicide, relative to the shooting, had been received in evidence, and, among other things, it appeared therefrom that the accused claimed that the deceased rushed toward the defendant threateningly with an open knife in his left hand and his left arm raised in a menacing attitude. The object of the testimony with reference to the condition of the deceased's left arm was to show that he could not raise said arm in the position described by the defendant to the witnesses who testified to his declarations. But, admitting that the testimony was irregularly received as a part of the prosecution's original case, if it was, nevertheless, proper in rebuttal, the fact that it was introduced out of order would not justify a reversal of the case. (*People* v. *Arrighini,* 122 Cal. 124, [54 Pac. 591] ; *People* v. *Crimes,* 132 Cal. 34, [64 Pac. 101].) The testimony was clearly relevant in view of the defendant's testimony.

It is also urged that the court erred in allowing the witness, Frank French, to testify to statements made by the defendant concerning the circumstances connected with the killing before the *corpus delicti* had been proved. What we have heretofore said with reference to the order of proof resting in the sound discretion of the trial judge is pertinent and applicable to this point. The rule appears to be settled in this state that, while the *corpus delicti* should be the first point to which the evidence should be addressed, the order of proof is usually in the discretion of the court, and, unless it clearly appears that the defendant has been prejudiced by the manner in which that discretion has been exercised, it will not justify reversal of the judgment. (*People* v. *Jones,* 123 Cal.

65, [55 Pac. 698].) The *corpus delicti* was subsequently shown by clear and undisputed proof, so the defendant could not have sustained any damage by the order in which proof of his extra-judicial declarations was received.

6. A model, representing the porch upon which the fatal shooting occurred, was introduced in evidence for the purpose of illustrating the testimony of the witnesses. The model was, except in certain particulars, a faithful representation of said porch. The excepted "particulars" to which we refer included an omission to show by the model some growing vines about the trellis-work at the side of the porch, to the right of which some one hundred feet distant, as we have seen, Cole and Gallagher, witnesses for the people, were sitting on a wagon tongue when the shooting took place. The model omitted also to indicate a tree and two fences which were located between the porch and the point where Cole and Gallagher were in conversation when the quarrel was going on and the shot fired. The specific objection to the model was that it might lead the jury to believe that there were no obstructions to a clear view of the porch from the point at which Cole and Gallagher were sitting, and that they could therefore see all that was transpiring on the porch between the defendant and the deceased. The county surveyor testified that he made the model, and that it represented an accurate reproduction of the porch, except in the particulars mentioned, and Mr. Ostrander, for the prosecution, upon offering it in evidence, explained the extent to which the people desired to use it as follows: "We are not introducing it for the purpose of showing that Cole or anybody else could see from the point where they were what transpired on the porch. We are offering this for the purpose of showing the porch as it then existed, the distances and the material objects on the porch. We are not offering it for the purpose of showing that the testimony of Cole or anybody else is true." And, as limited to the purpose as thus stated, the court admitted it, and it appears to have been confined, in its use by the people, to that purpose alone. We do not think the court erred in admitting the model under the circumstances disclosed by the record. There were photographs received in evidence, upon the motion of the defendant, showing an accurate representa-

tion of the house, of the porch with the trellis-work and climbing vines, and of the trees and fences between the porch and the place where Cole and Gallagher sat. The conditions generally existing about the premises at the time of the homicide were not only thus fully and clearly displayed before the jury, but were minutely explained by the witnesses. We can see no difference between the model complained of and a mere skeleton diagram of a place where a crime is alleged to have been committed, showing distances and the location of material objects necessary to be pointed out in order that the testimony may be the more clearly understood by the court, jury and counsel. Diagrams, which it is not pretended represent complete reproductions of the places thus sought to be illustrated, are often used at the trials of criminal cases, and where it is shown that, as far as they go, they speak the truth and in no degree prejudice the rights of the accused, they should not be rejected because they fail to show certain objects which are not material or important to the inquiry at hand, and therefore could serve no useful purpose in illustrating or clarifying certain important points brought out by the testimony. It does not appear from the record that any other purpose was attempted to be accomplished by the use of the model than to show the distances of certain points from others on the porch as they existed when the homicide occurred—for instance, the location of a pump and its distance from the door of the house leading to the porch, the location of the sink near which the deceased stood, etc. It has often been held that models and diagrams thus used and having no tendency to convey false impressions of the real conditions existing on and about the premises when the crimes under investigation were alleged to have been perpetrated may properly be used for the purpose of making the testimony the more clearly understood. (*People* v. *Durrant*, 116 Cal. 210, [48 Pac. 75] ; *People* v. *Shears*, 133 Cal. 158, [65 Pac. 295] ; *People* v. *Phelan*, 123 Cal. 551, [56 Pac. 424].)

7. We have carefully examined the instructions, in the giving, rejection and modification of which it is declared the court erred to the prejudice of the defendant, and we think there is no foundation for the criticisms urged against the action of the court with respect thereto. The charge of the

court was full, fair and pertinent to all the material issues presented by the information and the evidence. The principles of law contained in the instructions submitted by the defendant and refused by the court were, where applicable to any important issue in the case, embodied in and declared to the jury in other instructions. The same is true where the court modified certain instructions handed in by the defendant, the portions stricken out or refused, where appropriate and proper, being given in other instructions. The instruction upon the question of flight was not altogether inappropriate, as contended. It is true that the defendant finally surrendered himself voluntarily; but one of the witnesses testified that he met the accused on horseback shortly after the homicide, and that the latter said to the witness that he had killed Zander and that he desired to see his (witness') father, so that he could procure money with which to leave the country. The defendant was then riding away from the ranch where the shooting occurred. This testimony, though slight upon the subject of flight, constituted, we think, a sufficient predicate for the instruction complained of—at least, it was sufficient to preclude the presumption that the defendant was seriously prejudiced thereby.

The part of instruction No. 13 as given by the court, complained of by appellant, is certainly subject to the criticism that it is rather ambiguous. But what the court was trying to say to the jury in the criticised part it clearly enough stated in the latter part of the instruction. The instruction is based on subdivision 2 of section 2061 of the Code of Civil Procedure, and when given in the exact language of the section, as it should be given, if at all, involves a mere commonplace. It ought not to be necessary to tell a jury composed of men of average intelligence that they need not accept the testimony of any number of witnesses if such testimony does not convince them of the truth of the fact to which it relates, and this is in effect all that the language of the subdivision of the section from which the instruction was taken declares. We cannot perceive how the appellant could have been prejudiced by the instruction as given.

The same may be said of instruction No. 27, requested by the defendant and refused by the court. The first part of this

instruction is in the precise language of section 1845 of the Code of Civil Procedure, and the latter part is a declaration that the jury must disregard any part of the testimony of any witness which involves only his "belief or his inferences or his impressions or his deductions." It would have been well enough for the court to have given the instruction, yet we cannot see that the defendant was prejudiced by the refusal to give it. If testimony of the nature of that mentioned in the rejected instruction crept into the record, it must have found its way there through the failure of the defendant to object to it, or to have it stricken out after it got in, and if such testimony was given and then stricken out, it no longer remained in the record, and the jury, who must be assumed to be possessed of ordinary intelligence, must have known that they had no right to consider it in reaching a verdict from what the court told them, in its general charge concerning their duties as jurors.

We have thus reviewed the record at some length. There are other alleged errors pointed out in the briefs of appellant, but we have carefully examined them, and as a result of such examination have concluded that they do not merit extended attention. The alleged misconduct of the district attorney and his assistant in the opening statement of the case and in the final arguments thereof is not, conceding it to be, strictly speaking, misconduct, of such a serious nature as to call for a reversal. The complaint against the alleged misconduct of the assistant prosecuting attorney in referring in his argument to the alleged attempted flight of the defendant immediately after the homicide is disposed of in what we have said relative to the instruction upon that subject. The questions asked certain witnesses by the district attorney as to whether they had heard the testimony of another witness at the former trial of the case describing the condition or situation of the body of the deceased a few hours after the homicide elicited replies to the effect that either they did not hear such testimony or could not recall it if they did. Manifestly, the replies were harmless, even if the questions were improper, and there is nothing in the phraseology or form of the questions themselves involving prejudicial insinuations or innuendoes against the defendant.

An examination of the whole record convinces us that the defendant was fairly tried.

For the reasons expressed in the foregoing, the judgment and order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.