[Crim. No. 521. Fourth Appellate District.—March 28, 1939.]

THE PEOPLE, Respondent, v. LEROY TAYLOR, Appellant.

724

Earle N. Daniels, W. Eugene Craven and Ward Sullivan for Appellant.

Earl Warren, Attorney-General, Bayard Rhone, Deputy Attorney-General, Thomas Scott, District Attorney, and Norman F. Main, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendant was charged, in separate counts, with violations of sections 286, 288 and 288a of the Penal Code. A jury found him guilty on each count and he has appealed from the judgment and an order denying a new trial.

On August 16, 1938, the appellant registered at a motel in Bakersfield and was given room 97. A swimming pool was operated in connection with the motel and some new cottages were under construction on a portion of the motel grounds. A man named Best and a man named Cuevas joined the appellant that afternoon and the appellant and Best spent most of the afternoon in the swimming pool, going frequently to the appellant's room where the two consumed four-fifths of a quart of whiskey. The appellant testified that he drank more than Best did but Cuevas testified that the two shared it equally. A number of other people were using the pool and the appellant made himself conspicuous to the extent that the life guard cautioned him twice and later asked him to take Best away. The life guard testified that Best

was under the influence of liquor but that the appellant was not, and that they left the pool about 4 o'clock. Shortly before 5 the appellant took his friends home in his automobile, first going to Best's home and then to Cuevas' home. Cuevas testified that they arrived at his home about 5 o'clock; that the appellant told him that he was going to return to the motel to change his clothes; that when he left him he walked all right, drove the car all right, and his talk was normal and rational; and that when he left he said: "So long, see you later."

The appellant testified that when they reached Cuevas' home he stayed and talked to Cuevas for about five minutes but did not enter the house because he "wasn't feeling too good". He testified that the next thing he remembered was walking into a restaurant at 12 minutes to 7; that he ordered some coffee, ordered his dinner and made a telephone call at 7 o'clock; that he did not know where he had been from the time he left Cuevas until 12 minutes to 7; that after eating his dinner he went outside and started to look for his car; that at that time he did not know where his car was; that he later saw his car a block east and three-fourths of a block south of the restaurant; and that he then drove to Cuevas' house and remained with him until about 10:30, when he returned to his room at the motel.

The proprietor of the motel lived across the street from it. His son, David, who was then 7 years and 2 months old, had spent the afternoon in and around the swimming pool. An employee of the motel testified that on three different occasions that afternoon he had seen the appellant pick up David and make believe he was going to throw him into the pool. The life guard testified that David left the pool at exactly 10 minutes after 5. David testified that when he left the swimming pool he went over to where the new cottages were under construction; that when he got there another boy, "Toddy", who was 9 years old, came across the street to play with him; that he and Toddy were climbing up on a platform and jumping into some sand; that while they were doing this the appellant came over and talked to them; that the first thing he remembered the appellant saying was "Let's see who has the best sunburn;" that he and the appellant walked over toward the new cottages; that Toddy would not go, so he went back to the

platform; that after a little while Toddy's mother called him and he went home; that the appellant then "tried to coax me over again, so I went over to" about the same place where the appellant had gone before; that the appellant said, "This room looked like a good one" and went in about three steps; that he did not go in and the appellant came out; and that as he was walking along the porch the appellant "came and picked me up and took me into this last room". He then described certain acts which there occurred, and upon which these charges are based. With one exception, hereafter noted, no contention is made that the evidence is not sufficient to sustain the verdict and judgment.

Toddy testified that he was playing with David on the platform in front of the new cottages toward the end of this afternoon; that he saw the appellant there; that the appellant said: "Who has the best sunburn?"; that the defendant then said: "Let's go look in one of these cottages;" that he did not go; that David went and then came back; that he said: "Im not going, David," that David replied, "Then I'm not either;" that the appellant went over to the cottages and then came back to where he was standing; that his mother called him and he went home; that at that time David was jumping from the platform and the appellant was near by; that after he had eaten his supper he came back to the platform; that he was gone about 30 or 40 minutes and then came back; that when he saw David was not at the platform he went over toward the cottages; that from where he stood he could see the door of the last cottage; that David came out from the last cottage and was crying; that David went home; that after David came out of the door he saw the appellant come out of it; and that when David came out of the door he said: "Keep away from there, there is a man in there."

The father and mother of David testified that they were eating dinner and that about a quarter after 6 David came in crying hysterically. He told his mother what had occurred and she examined his body and called his father, who also examined him. He was taken to a doctor, who testified as to what he found. Officers who were called were given a description of the appellant by David, Toddy and the life guard. They searched room 97 and, among other things,

found an empty whiskey bottle, a white polo shirt, a pair of white linen trousers and a pair of white shoes with brown saddles.

When the appellant returned to his room shortly before 11 o'clock, the officers took him across the street to the home of David's father. Both David and Toddy were brought in to look at the appellant and then taken out where they had a conversation with the officers. What was said is not in the record, but shortly thereafter the appellant was arrested and was, in effect, told that it was for these offenses. An officer testified that the appellant told him that he did not know whether he had done such a thing; that he could not remember anything from the time he left the motel shortly before 5 o'clock to take two acquaintances home until 7 o'clock when he came to himself in a restaurant; that he said he was so drunk he could not remember where he left his automobile and had to look for it around the streets and finally found it; that the appellant said, "he had no recollection of having molested the boy, but that if the boy said he did and the evidence pointed to him, he guessed he must have done it"; and that at the time they arrested him the appellant was perfectly sober. A maid employed at the motel testified that she saw the appellant between 5 and 6 o'clock on that afternoon near his room, at which time he asked her for a bath towel.

■ The first assignment of error is that the court erred in refusing to permit the appellant to attempt to impeach the testimony of David with respect to the kind of clothing worn by the person he said had molested him, by reading to the jury inconsistent statements made by David in his testimony at the preliminary hearing. At the trial, in December, 1938, David testified that on August 16th, when the events in question transpired, the appellant did not wear glasses, that he had on a pair of shoes and a white polo shirt. By way of impeachment the appellant sought to introduce the record of David's testimony at the preliminary hearing held on September 15, 1938, during the course of which he had answered questions as to whether at that time the appellant wore glasses, whether he had on a pair of shoes or a pair of slippers, and whether he had on a white shirt or a gray shirt, by saying "I forget." The proffered evidence was

excluded, the court sustaining an objection on the ground "There is no inconsistency." The clothing found in appellant's room was introduced in evidence and corresponded to the description given by David at the trial. The fact that he could then describe it but could not at the time of the preliminary hearing, several months before, constituted an inconsistency in his testimony, at least in the absence of an explanation. It appears to us beyond question that the evidence was admissible and that its exclusion was error. Perhaps that error would be sufficient, in spite of the provisions of section 4½ of article VI of the Constitution, to justify a reversal in a close case, as to the identity of the one who committed a crime, where the question of identity rested largely upon a description of the clothing worn by the party. (*People* v. *Turner*, 118 Cal. 324 [50 Pac. 537].)

The clothing here in question was only a part of the means of identification available to David. David positively identified the appellant and Toddy, who saw them both emerge from the room, also identified him. The maid saw him there between 5 and 6 o'clock and the life guard identified him as being there in the afternoon. All of these witnesses had had a rather unusual opportunity to observe him and two of them had seen him over a period of two hours when all he had on was swimming trunks. Two of these witnesses, aside from David, had seen him in the motel grounds between 5 and 6 o'clock, after he had left Cuevas, to whom he said he was returning to the motel to change his clothes. The appellant himself did not deny that he was there at the time the crime was committed but claimed he was unable to remember anything that occurred from the time he left Cuevas' home until he entered the restaurant. He had told Cuevas he was going to return to the motel and when he left Cuevas he was able to walk and drive all right and his talk was rational. He seems to have been able to drive his car a considerable distance and to park it in downtown Bakersfield. While he says he could not remember where he left his car he seems to have had little trouble in finding it a couple of blocks from the restaurant. Regardless of the plain inconsistency in David's testimony on these two occasions, with respect to a description of the clothes, there is such strong evidence of the identity of the appellant that it cannot be conceived that the admission of the re-

jected testimony would have changed the result. We are far from convinced that a miscarriage of justice has occurred in this respect, and we therefore hold that this error is not sufficiently prejudicial to justify a reversal. (*People* v. *Hale*, 64 Cal. App. 523 [222 Pac. 148].)

■ Complaint is next made of an instruction given by the court to the effect that false statements made by a defendant are admitted in evidence as tending to show consciousness of guilt and that if the jury believed beyond a reasonable doubt that this defendant had made false statements as to the facts on which the charges in this case were based, knowing them to be false, the same, although not conclusive as to his guilt, might be taken as strengthening the inferences of guilt, if any, arising from other portions of the evidence. It is argued that this instruction singled out the appellant from other witnesses and placed greater emphasis upon the possibility of his testimony being false, and that it failed to inform the jury that any such false statement must relate to some material matter connected with the offenses of which he was charged. The instruction related to evidence which was before the jury, the jury was not told that a different rule applied to the appellant than that governing other witnesses, the jury was elsewhere instructed that any witness wilfully false in one part of his testimony was to be distrusted in others, and the instruction particularly pointed out that any such false statements must relate to the facts on which the charges were based.

■ It is next contended that the court erred in refusing to give an instruction requested by the appellant to the effect that the jurors were not bound to decide in conformity with any number of witnesses which did not produce conviction in their minds as against a less number of witnesses or against a presumption, or against other evidence satisfying their minds. This was refused and marked ''Covered elsewhere''. It does not appear that the contents of this instruction were in terms given in any other instruction, although subdivision 2 of section 2061 of the Code of Civil Procedure provides that a jury is to be so instructed on all proper occasions. It does appear that the court gave all of the usual instructions on presumption of innocence, giving the defendant the benefit of that presumption, the burden of

proof, and that the members of the jury are the sole judges of the evidence, having the duty of weighing the evidence and determining the credibility of the witnesses. The court also instructed the jury as follows:

"You are instructed that you are the sole judges of the credit to be given to the testimony of the different witnesses. You are not bound to believe anything to be a fact merely because a witness states it to be so, provided you believe from the evidence that such witness is mistaken, or has knowingly testified falsely.

"You are further instructed that you are the exclusive judges of the credibility of the witnesses who have testified, and that you have the right to determine, from their character and conduct, from the appearance of the witnesses on the stand, their manner of testifying, their apparent candor, fairness and intelligence, their relation to the parties, their apparent bias or impartiality, the strength or weakness of their recollection, and from all other circumstances in the case appearing on the trial, which witnesses are worthy of credit, and to give credit accordingly.''

In *People* v. *Maughs,* 8 Cal. App. 107 [96 Pac. 407], in discussing an ambiguous instruction along the line of the one here requested and refused, the court said:

"The instruction is based on subdivision 2 of section 2061 of the Code of Civil Procedure, and when given in the exact language of the section, as it should be given, if at all, involves a mere commonplace. It ought not to be necessary to tell a jury composed of men of average intelligence that they need not accept the testimony of any number of witnesses if such testimony does not convince them of the truth of the fact to which it relates, and this is, in effect all that the language of the subdivision of the section from which the instruction was taken declares. We cannot perceive how the appellant could have been prejudiced by the instruction as given.''

This instruction should have been given. However, the jurors were instructed that they were to determine which witnesses were worthy of credit, and that they were not bound to accept anything as a fact merely because a witness stated it to be so. The jury must have understood that if they were not bound by the testimony of any witness they

were not bound by the testimony of any number of witnesses. Under the circumstances here appearing, it is not reasonable to believe that any prejudice resulted to the appellant from the failure to give this instruction, and a reading of the entire transcript confirms this impression.

■ The appellant next assigns as error the refusal to give two instructions requested by him. The first of these was to the effect that the defendant was not capable of committing the crime charged and must be found not guilty, in the event the jury found that at the time of the commission of the alleged crime or immediately prior thereto he "had been drinking intoxicating liquor and if you further find that by reason of said intoxication the defendant was not conscious of his acts at the time that he is alleged to have committed the crime of 288 P. C.". The second instruction is to the effect that no person may be convicted of a crime which was committed while such person was in an unconscious condition, and that if the jury believed from the evidence that a crime had been committed by the defendant but reasonable doubt existed in their minds as to whether or not the defendant was conscious of his acts in relation to the commission of the offense, he must be found not guilty.

■ It is contended that the appellant was entitled to these instructions under subdivision 5 of section 26 of the Penal Code, which includes "persons who committed the act charged without being conscious thereof" among those persons who are not capable of committing a crime. Subdivision 5 of section 26 was not meant to cover insanity, which is covered elsewhere. (*People* v. *Methever,* 132 Cal. 326 [64 Pac. 481].) Also, it was not meant to cover that temporary interference with the functioning of the mental faculties which results from voluntary intoxication, which is covered and governed by section 22 of the Penal Code. In *People* v. *Lim Dum Dong,* 26 Cal. App. (2d) 135 [78 Pac. (2d) 1026], the court said:

"Under the provisions of section 22 of the Penal Code the rule is well established in California that temporary aberration of the mind caused by voluntary intoxication induced by excessive use of liquor or narcotics is not a valid defense to a charge of crime. To relieve one of responsibility for the commission of an offense on the ground of voluntary

intoxication from the effect of liquor or narcotics, it is necessary to prove that the brain has become permanently affected thereby. (*People* v. *Hower,* 151 Cal. 638 [91 Pac. 507]; *People* v. *Fellows,* 122 Cal. 233 [54 Pac. 830]; *People* v. *Bremer,* 24 Cal. App. 315 [141 Pac. 222]; *People* v. *Goodrum,* 31 Cal. App. 430 [160 Pac. 690].)''

And, also:

''The court properly refused to give to the jury the defendant's proposed instruction as follows:

'' 'You are instructed that if you find that defendant committed the act charged in the information, *without being conscious thereof,* then he was incapable of committing a crime; and your verdict should be that defendant was insane at the time the offense was committed.'

''As was said in the Hower case, *supra,* the preceding proffered instruction omits the necessary element of consciousness of the nature of an act which is the result of voluntary intoxication or temporary mental derangement caused by an inordinate use of narcotics. The instruction should have indicated to the jury that the lack of consciousness of the nature of the act which would relieve the defendant from responsibility must have resulted from permanent insanity as distinguished from temporary insanity caused by the defendant's voluntary use of morphine or cocaine.''

The violation of section 288 of the Penal Code, as charged in count I of the information, involved a specific intent. In three instructions which were given the court fully and correctly instructed the jury as to the law in this respect, in one of which the provisions of section 22 of the Penal Code were substantially repeated. No error appears in this connection.

The final contention is that the evidence is legally insufficient to support the verdict and judgment upon count II of the information, charging a violation of section 286 of the Penal Code. Without reviewing the evidence it is sufficient here to say that this contention is based upon one portion of the testimony given by David and one portion of the testimony given by the physician who examined him shortly after the offense was committed. The arguments here made go only to the weight of the evidence and have no place here. No doubt they were presented to the jury and, if so, it is not surprising that the jury did not accept them as control-

ling.   The evidence in this regard, in its entirety, is amply sufficient to support the verdict and judgment.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 27, 1939.