[Crim. No. 5087. In Bank. Oct. 24, 1950.]

THE PEOPLE, Respondent, v. LORENZO ZERILLO, Appellant.

Harold C. Faulkner, A. J. Zirpoli and Melvin, Faulkner, Sheehan & Wiseman for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney (San Francisco), and Norman Elkington, Assistant District Attorney, for Respondent.

GIBSON, C. J.—Defendant, president of Riverbank Canning Company, was convicted of offering a bribe to Milton P. Duffy, Chief of the Bureau of Food and Drug Inspection of

the State of California, and he has appealed from the judgment and from the order denying his motion for a new trial.

In 1944 the bureau quarantined several thousand cases of canned tomato paste packed by the Riverbank Canning Company, and 1,861 cases of the goods were still held under quarantine on November 18, 1946, the day of the alleged bribe. The evidence is sharply conflicting as to what occurred between Duffy and defendant.

Duffy testified that defendant called on him at his office in San Francisco and asked him to release the quarantined goods so that defendant could sell them and give the proceeds to a church and school. Duffy answered, ''that stuff is not going to be sold, it's going down the sewer.'' Defendant then said ''Here is a little present for you.'' Although Duffy protested that he did not want a gift, defendant took a small package out of his pocket and laid it on the desk. Duffy asked if the package contained money, and defendant assured him that it did not. Whereupon Duffy opened the package and found that it contained a number of fifty dollar bills which defendant told him amounted to $5,000. Duffy said, ''I am surprised. Did you think you were going to pull anything like that on me?'' He then called in an assistant named Wheeler and stated in defendant's presence that defendant had just offered him a $5,000 bribe. Defendant then denied that he had offered any bribe and claimed that Duffy had ''misunderstood'' him, saying, ''I wanted that $5,000 to go to charity.'' Defendant begged Duffy not to make any trouble and finally left after Duffy told him to get out.

Wheeler testified that Duffy called him into his office and said to him, in defendant's presence, ''Zerillo has just offered me a bribe of $5,000.'' Duffy repeated the accusation several times, and defendant replied, ''No, Mr. Duffy, you misunderstood me. That was not a bribe . . . I offered you $5,000, but you misunderstood me. I wanted you to give it to charity. . . . All I wanted to do was to be friend to you in the department. Let's shake hands and be friends.'' Duffy then ordered defendant to ''get out and stay out,'' and defendant left.

Defendant testified that he neither gave nor offered Duffy any money and denied that he had a package of money in his possession. He said that he told Duffy that he was building a church and a school and that he then brought up the subject

of the quarantined goods, saying, "Now, Mr. Duffy, I got obligated to build this Catholic Church down at Riverbank and to help build the school for the children, a Catholic school in Modesto. I would like to have you release those goods because I know I can sell, there is demand for goods, and the proceeds of those goods I will like to give about $5,000 to the Catholic Church and the balance for the school or charity in the community." Duffy became angry and accused him of wanting the goods released for himself and not to help build a church. Defendant answered, "No, I didn't come here to release those goods for myself. I don't need any money, thank God. I just come here to help the community, do good for my community." Duffy accused defendant of offering him money in order to obtain the release of the goods, and defendant answered, "No, Mr. Duffy, I don't want to offer any money. I have no money to offer you." Duffy called Wheeler into the room, and defendant said, in Wheeler's presence, "I didn't come here to offer any money. I haven't got any money." In response to Duffy's statement that he could arrest him, defendant replied, "I am here if you want to arrest me. I am not going to run away. I am here. Why don't you arrest me." Duffy then ordered him to leave.

The evidence is clearly sufficient to support the judgment, but defendant claims that a reversal is required because of prejudicial errors committed in the admission and exclusion of evidence and in giving and refusing to give instructions to the jury.

The prosecution, over objection, introduced interoffice reports made by a chemist employed by Riverbank concerning the purity of tomato paste packed in 1946, and also introduced copies of letters sent by defendant prior to November 18, 1946, requesting eastern agents of the cannery to sell goods from the 1946 pack immediately. The paste, canned in 1946, was not referred to in the conversation between defendant and Duffy which, as we have seen, related to goods quarantined in 1944, and defendant contends that the evidence was irrelevant and immaterial and that he was greatly prejudiced by its admission. We are of the opinion, however, that it was relevant on the question of motive or intent and was properly admitted.

The reports showed that in the chemist's opinion certain batches of the 1946 pack contained too high a mold and insect fragment content to meet state and federal pure food standards, and that other batches were so close to the allow-

able limit that they should not be sold without reexamination. The letters mentioned above referred to some of these batches by number. There was proof from which the jury could infer that the reports had come to defendant's attention prior to November 18, 1946, when he visited Duffy's office. The jury could also infer that defendant hoped to influence Duffy's conduct with regard to the 1946 pack as well as to obtain release of the goods held in quarantine, since, if Duffy were induced to take a bribe in connection with the 1944 goods, he would be less likely to interfere with defendant's disposal of the 1946 pack. The evidence was thus relevant on the question of intent or motive, and the fact that it might also tend to show the commission of another offense, namely, disposal of goods in violation of pure food and drug laws, did not warrant its exclusion. The record shows that the court instructed the jury that the evidence was admitted for a limited purpose and was to be considered by them only for what bearing it might have on defendant's motive or intent at the time he allegedly approached Duffy with an offer of a bribe.

It is true that the chemist conceded that the tests conducted by him differed from pure food tests made by federal authorities, that only one can was taken as a sample from a batch of approximately 10,000 cans at Riverbank, and that the findings therefrom were not conclusive as to whether the batch was substandard. He also admitted that, "It is quite possible that two chemists analyzing the same batch may get different results, either worms or molds." This testimony, however, went merely to the reliability of the reports and did not render them inadmissible. Later in this opinion we shall discuss the admissibility of evidence offered by defendant to show that 1946 goods referred to in the reports were not contaminated and successfully passed state tests.

On cross-examination the prosecution was permitted to question defendant at length about his knowledge of the chemist's reports and about the letters to the eastern agents. Defendant contends that the prosecution improperly exceeded the permissible scope of cross-examination because he had not been questioned regarding these matters on his direct examination.

Section 1323 of the Penal Code provides: "A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a

witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. . . ." This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. (See *People* v. *Wilson,* 25 Cal.2d 341, 351 [153 P.2d 720]; *People* v. *King,* 13 Cal.2d 521, 527 [90 P.2d 291]; *People* v. *Mammi-lato,* 168 Cal. 207, 213-214 [142 P. 58]; *People* v. *Buckley,* 143 Cal. 375, 388-389 [77 P. 169]; *People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338]; *People* v. *Dole,* 122 Cal. 486, 491 [55 P. 581, 68 Am.St.Rep. 50].) It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. (*People* v. *Kynette,* 15 Cal.2d 731, 753 [104 P.2d 794]; *People* v. *Creeks,* 170 Cal. 368, 379 [149 P. 821]; *People* v. *Buckley,* 143 Cal. 375, 388-389 [77 P. 169].) ▮ Defendant argues that the 1935 amendment to section 1323, giving counsel the power to comment on "the failure of the defendant to deny any evidence or facts in the case against him," necessarily indicates that a defendant may testify and yet neither have to explain or deny facts introduced against him. This is true only to the extent that such "evidence or facts" are not within the scope of his direct examination, since the section expressly states that a defendant "may be cross-examined . . . as to all matters about which he was examined in chief." It is well settled that the section as it existed prior to 1935 did not have the effect of confining the cross-examination of an accused to any narrower limits than in the case of any other witness (*People* v. *Rozelle,* 78 Cal. 84, 92-94 [20 P. 36]; *People* v. *Gallagher,* 100 Cal. 466, 476 [35 P. 80]; *People* v. *Dole,* 122 Cal. 486, 491 [55 P. 581, 68 Am.St.Rep. 50]; *People* v. *Creeks,* 170 Cal. 368, 379 [149 P. 821]), and there is nothing in the 1935 amendment to indicate any intent to establish a special rule governing the scope of cross-examination of a defendant in a criminal case. (See 3 Wharton on Criminal Evidence [11th ed. 1935] § 1323.) ▮ If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. (See *People* v. *Gallagher,* 100 Cal. 466, 473-476 [35 P. 80]; *People* v. *Creeks,* 170 Cal. 368, 378-380 [149 P. 821].) ▮ Moreover, as stated in *People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338], "A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony

against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states." (See, also, *People* v. *Mayen,* 188 Cal. 237, 257-258 [205 P. 435, 24 A.L.R. 1383]; 13 Cal.L.Rev. 384-387.) Language to the contrary in *People* v. *Arrighini,* 122 Cal. 121, 127 [54 P. 591], must be deemed to have been impliedly overruled by later cases.

In the present case, defendant's testimony, which was contrary to and inconsistent with Duffy's version of their conversation, was to the effect that his purpose and motive in seeking release of the quarantined goods was to benefit his community. Proof, however, that he went to Duffy's office believing that numerous batches of the 1946 pack were substandard and might be destroyed or held up in quarantine, would tend to overcome any implication that he sought release of the 1944 goods only to benefit his community and did not seek to influence Duffy unlawfully. Moreover, this testimony, together with defendant's express denial that he offered any money to Duffy, was equivalent to a general denial of the crime charged and opened the door for examination as to his intent and motives. Under the circumstances, the questions concerning his knowledge of the chemist's reports relating to the condition of the 1946 pack did not exceed the proper scope of cross-examination.

Defendant next complains of the exclusion of evidence regarding the actual condition of the 1946 pack. On cross-examination he denied all knowledge of the chemist's reports introduced by the prosecution and testified that when he wrote the letters to the eastern agents, which was immediately prior to his visit to Duffy, he believed that the goods mentioned therein were "perfect." On his redirect examination he offered to prove that after November 18, 1946, the date of the alleged bribe, the State examined over one-half of the batches described in the reports as substandard, and that all of these batches passed pure food tests. The court excluded this evidence on the theory that the actual condition of the 1946 goods was immaterial. This ruling was erroneous. The chemist's reports and the letters were introduced for the asserted purpose of showing that defendant had an undisclosed reason or motive for offering a bribe to Duffy. Obviously

the reports would have no relevancy unless they stated that the 1946 goods were bad. However, insofar as the reports may have indicated that the goods were actually bad and could not pass official examination, it would be unfair and unjust to defendant to leave the reports unanswered. This is particularly so in view of the fact that the letters written by defendant, together with the unanswered evidence, would make it appear that defendant was disposing of impure foods in violation of law. It would be manifestly improper for us to hold that defendant should be precluded from showing the purity of the 1946 goods on the theory that such proof would not show what his belief, motive or intent was at the time of the interview with Duffy. It is clear that when evidence of other crimes or acts has been admitted for some purpose an accused should be allowed to explain or deny the transactions. (*People* v. *Stutsman,* 66 Cal.App. 134, 139-140 [225 P. 477] ; see *State* v. *Sexsmith,* 186 Wash. 345 [57 P.2d 1249, 1252] ; *McLendon* v. *United States,* 13 F.2d 777, 779; 22 C.J.S., p. 1113.) Moreover, evidence that goods described in the chemist's reports as substandard subsequently passed state tests tends to show that the goods were actually acceptable when defendant wrote to the eastern agents prior to his interview with Duffy. If the products could comply with pure food regulations at that time, the jury might reasonably infer that defendant would be aware of the fact, inasmuch as he was president of the canning company and, as such, was presumably aware of its affairs, including the conditions under which food was handled and packed. Thus the offered evidence is in accord with and supports defendant's testimony that when he wrote to the eastern agents he believed that the goods mentioned in the letters were up to standard.

It is apparent from an examination of the record in the present case that the exclusion of evidence showing that the 1946 goods passed official examination was highly prejudicial to defendant. Approximately two-thirds of the time at the trial was consumed in the presentation of evidence relative to the 1946 pack. The chemist alone was on the stand for some two and one-half days, giving technical and detailed explanations of his adverse reports on some 140 batches of tomato goods. The situation was aggravated by the fact that despite repeated objection by defendant, on four or five occasions during the course of the trial the district attorney referred to the 1946 goods mentioned in the chemist's reports as if it were a settled fact that they were "contaminated" or "defective"

or unable to pass pure foods tests. On some of these occasions the court instructed the jury to disregard counsel's remarks. However, in his argument to the jury the district attorney was permitted, over objection, to refer to the 1946 goods in the following manner: "We have 1,430,000 cans of tomato paste insect and worm ridden above the limits of tolerance, moldy, would not pass the inspection of the Bureau of Food and Drugs, of Mr. Duffy." In stating that the goods would not pass official inspection, the district attorney not only took an unfair advantage of the erroneous rejection of defendant's offer of proof of facts to the contrary, but also assumed a matter not in evidence, because the only showing consisted of the opinion of the Riverbank chemist that the goods were below standard. Further, in failing to connect the argument with defendant's state of mind, the district attorney disregarded the trial court's ruling that the chemist's reports were not relevant except as evidence on the question of defendant's state of mind, his intent or motive, at the time of the alleged bribe.

It is next claimed that the trial court erred in striking out certain testimony. As we have seen, defendant testified in effect that his intention in going to see Duffy was to persuade him to release the quarantined goods so that defendant could sell them and give part or all of the proceeds for the building of a church and school. Defendant called as a witness the priest of the parish in which the church was being built. This witness testified that he had been invited by defendant on the morning of November 18 to accompany defendant to visit Duffy, and the testimony was subsequently stricken on motion by the prosecution. This action on the part of the trial court was erroneous because defendant's specific intent was in issue and the testimony had a direct bearing on that intent. The invitation was evidence that defendant had an innocent intent with regard to the interview since the priest's acceptance of the invitation might well have defeated the purpose of the visit if that purpose had been the offering of a bribe.

The court gave the following instruction to the jury: "Now in every crime or public offense there must exist a union or joint operation of act and intent. To constitute criminal intent it is merely necessary that a person intend to do an act, which if committed, will constitute a crime. When a person intentionally does that which the law declares

to be a crime, such person is acting with criminal intent even though he may not know that such act is unlawful and even though there be no bad motive.'' It is not claimed that any of the statements in the instruction are erroneous as abstract propositions of law when given in a proper case, but defendant argues that where, as here, a specific intent is an essential element of the crime charged, the instruction is confusing and misleading.

It would seem clear that where specific intent is in issue this instruction should not be given without explanation, and that it should be qualified by adequate instructions on the requirement of specific intent. In the present case the jurors were not given any direct explanation or qualification of the instruction, but we cannot say that they were misled in view of the fact that they were repeatedly instructed elsewhere that the making or offering of a gratuity or present to a public official is not criminal ''unless there was a prior corrupt understanding or the act of giving or offering to give is at the very time coupled with a corrupt intent to influence the recipient in the discharge of his duty in a public or official capacity,'' and that defendant could not be found guilty unless the jury was satisfied that he offered a bribe to Duffy ''with the intent to then and there corruptly influence him in respect to'' any official act.

The challenged instruction used the expression ''criminal intent'' in its narrow and proper sense, defining it as nothing more than the intentional doing of ''that which the law declares to be a crime,'' and, as we have seen, other instructions pointed out in several places that the act in the present case ''which the law declares to be a crime'' is the offering of a bribe with specific intent to influence official action. As so used and defined, the expression ''criminal intent'' was not broad enough to mislead the jury, and the instruction did not, as claimed, authorize the jury to infer a specific intent on defendant's part from the mere act of his offering money to Duffy. (Cf. People v. Maciel, 71 Cal.App. 213, 216-219 [234 P. 877].) The instruction in question differs considerably from those involved in the cases relied on by defendant, and, unlike them, is not reasonably susceptible to a construction which would permit the jury to base a finding of specific intent upon a presumption of law. (See People v. Snyder, 15 Cal.2d 706, 708-710 [104 P.2d 639] ; People v. Miller, 2 Cal. 2d 527, 532-533 [42 P.2d 308] ; People v. Landman, 103 Cal. 577, 579-581 [37 P. 518] ; People v. Mize, 80 Cal. 41, 44-45

[22 P. 80] ; *People* v. *Brown,* 27 Cal.App.2d 612, 614-616 [81 P.2d 463] ; *People* v. *Maciel,* 71 Cal.App. 213, 216-219 [234 P. 877].)

Defendant finally contends that the trial court erred in refusing to give certain requested instructions to the effect that where circumstantial evidence is relied upon as proof of guilt to justify a conviction, the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion. (See *People* v. *Koenig,* 29 Cal.2d 87, 91-93 [173 P.2d 1] ; *People* v. *Bender,* 27 Cal.2d 164, 175 [163 P.2d 8].) Although it has been held that it is not error to refuse to give such an instruction where the circumstantial evidence is merely incidental to and corroborative of direct evidence, because of the danger of misleading and confusing the jury when the inculpatory evidence consists wholly or largely of direct evidence of the crime (*People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805] ), such was not the state of the evidence in the present case. Here the direct evidence of the commission of the crime of bribery formed but a small part of the prosecution's case. All the rest of the testimony was indirect and circumstantial, and it related to matters connected with the visit to Duffy's office and defendant's knowledge of the condition of the 1946 pack. This other evidence could have been viewed by the jury either as being consistent with defendant's innocence or as being consistent with his guilt. It follows that defendant was entitled to have the jury instructed as to the rule to be followed in considering circumstantial evidence.

Under all the circumstances of this case, we are of the opinion that the cumulative effect of the errors discussed above resulted in a miscarriage of justice. Since the judgment must be reversed for this reason, we need not discuss the other assignments of error because the same situations will probably not arise on a retrial.

The judgment and order denying a new trial are reversed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.