[No. F004711. Fifth Dist. Dec. 8, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
LESTER LOUIS HUTTON, JR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through VI.

**COUNSEL**

James H. Jahn, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller and William George Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BALLANTYNE, J.—**

FACTS AND PROCEEDINGS BELOW

In May 1983, defendant and appellant, Lester Louis Hutton, Jr. (Hutton), began working as a salesman for the downtown branch of Woody's Toy Circus in Bakersfield. By early August 1983, Hutton began training to become a general manager of the store. Yvonne McDaniel (McDaniel)[1] was hired as bookkeeper for Woody's Toy Circus at approximately the same time as Hutton began training to become store manager.

---

[1] Mrs. McDaniel's name was changed to Croxton two weeks before trial. She will hereinafter be referred to as McDaniel, her name during the incident.

Ordinarily, as part of her duties, McDaniel would match the daily deposit slips with the daily sales reports. During the Christmas season of December, however, she was too burdened to reconcile these figures. Because the toy store was taking in larger receipts during December, Hutton suggested that he should begin to make deposits to the bank as a security precaution. Deposit slips, daily sales reports, and actual deposits were usually made by employees Sharon Moore or Cathy Gobel (Gobel). Sharon Moore and Gobel continued to prepare deposit slips and sales reports even though Hutton made most of the deposits.

Woody Bryant (Bryant), the owner of Woody's Toy Circus, began suspecting that there were cash shortages occurring in the December deposits. He discussed the problem with McDaniel in Hutton's presence. These conversations took place on Tuesday or Wednesday before Christmas 1983. On Thursday evening, December 22, 1983, a fire of incendiary origin destroyed Woody's Toy Circus. It was accelerated by gasoline and started in two locations. Fire investigators found no signs of forced entry and the store safe was discovered standing open in the debris. The position of the safe tumblers indicated that the safe had not been forced open but had been opened through use of the combination. Only Bryant, Sharon Moore, Gobel and Hutton had access to the store keys, the alarm system combination, and the safe combination.

On the evening of the fire, the store's employees left at 9:30 p.m. Hutton was the only person seen in the store as the last of the employees left. Between 9:45 p.m. and 10 p.m., Hutton purchased a soft drink, a gasoline tank and gasoline at a nearby 7-Eleven convenience store. A customer called Woody's Toy Circus at approximately 10 p.m. and a male answered the phone and answered the customer's questions. The police dispatcher received the initial report of fire at 10:38 p.m.

After securing a search warrant, Hutton's apartment was searched on December 28, 1983. The police found $10,264 in cash in a paper bag inside a bathroom closet adjoining the master bedroom.

Hutton told the police that the $10,000 was a gift from his live-in girlfriend's mother. Defendant's girlfriend, Mary Notaro (Notaro), confirmed the fact that her mother had loaned her $10,000. Of that amount, however, only $500 remained as of December 1983. Hutton's total salary from Woody's Toy Circus in 1983 was $10,730.75 plus $1,100 in commissions from the sale of portable swimming pools. During December 1983, Hutton spent $1,800 for a new stereo and book shelves.

A two-count information was filed in superior court charging Hutton in count I with a violation of Penal Code section 451, subdivision (c) (arson),

and in count II with a violation of Penal Code section 487, subdivision 1 (grand theft). Defendant filed a motion to traverse and to quash the search warrant upon the grounds that the affidavit for the search warrant contained wilfully false statements and omissions. The motion was denied.

On the eighth day of trial, defendant moved to be appointed cocounsel for the limited purpose of cross-examining McDaniel, the bookkeeper. After the court denied the motion, Hutton then moved to have his counsel from the public defender's office relieved and to proceed in propria persona. The court conducted an extensive *Faretta* hearing before granting this motion. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].)

The trial continued for another 11 days with Hutton acting as his own counsel. Hutton was acquitted of the arson charge and was found guilty of the grand theft violation.

DISCUSSION

I.

DEFENDANT'S MOTION TO BE ALLOWED COCOUNSEL STATUS.

To establish its case, the prosecution relied on several witnesses. Three of the most important witnesses were Sharon Moore, Yvonne Moore and McDaniel. Sharon Moore was floor manager of the downtown store. Sharon Moore and Yvonne Moore each testified that the defendant first began to make sales deposits in December, although there was some disagreement between the witnesses as to whether or not Hutton made every single deposit.

Cash reports for December 10, 11, 12, 17, 18, 19 and 22 were destroyed in the fire. Using undestroyed records and bank records, however, the prosecution established that nearly $7,800 in cash was missing from deposits made December 6, 8, 13 and 20. This evidence was established through the testimony of Sharon Moore and McDaniel. The prosecution concluded its direct testimony of McDaniel at the end of the seventh day of trial.

On the eighth day of trial, the defendant's counsel, Mr. Adams (Adams), moved that Hutton be permitted to act as cocounsel for the limited purpose of cross-examining McDaniel. Adams asserted that the substance of McDaniel's testimony was complex and that he was unacquainted with accounting and bookkeeping. Adams felt that Hutton was far more qualified to ask appropriate questions on cross-examination because he understood

internal procedures at Woody's Toy Circus better than Adams did. Adams represented that he had spent countless hours discussing book work issues and calculations with his client. Adams, however, simply failed to grasp Hutton's explanation of the procedures. Given the liberty interest that his client had in the outcome of the trial, Adams argued that a limited appointment of cocounsel status for a single cross-examination would be in the best interests of his client.

The court denied the defense motion making the following observations: "Mr. Adams, you are about as competent a counsel as ever come [*sic*] down the pike in this court, and I mean that sincerely, and I appreciate the difficulty. I will give you all the time in the world you want to consult with Mr. Hutton. Mr. Hutton has had no legal experience. It is not the court's policy. I could conjure up a case where cocounsel, where a defendant might be appointed cocounsel, but this is not one. The motion is denied."

Immediately after the trial court denied the defendant's motion to be appointed cocounsel, the defendant made his own motion to be appointed counsel in propria persona under *Faretta* v. *California, supra.* Hutton left no doubt that the underlying reason for making his *Faretta* motion was because the trial court had denied his motion to be appointed cocounsel. The trial court then conducted a very exhaustive *Faretta* hearing to determine the defendant's competency, whether his waiver of counsel was intelligent and voluntary, the defendant's educational background including his experience in accounting procedures, and admonitions as to the competency and preeminence of both the defendant's counsel and the prosecuting district attorney. The defendant studied architecture and marine biology at Cal Poly, San Luis Obispo, for two and one-half years and was a division manager with Circle K Corporation for two years, where the defendant learned complex accounting procedures.

■ There is no question that the trial court conducted a proper *Faretta* hearing admonishing the defendant exhaustively as to the risks he was taking in representing himself. The court took a complete waiver and determined that the defendant was making an intelligent and voluntary decision. (*People* v. *Spencer* (1984) 153 Cal.App.3d 931 [200 Cal.Rptr. 693].)

■ The issue here presented is whether the trial court abused its discretion in denying the defendant the right to act as cocounsel for a single cross-examination of a crucial witness.

■ The defendant concedes that he has no constitutional right to co-counsel status. (*People* v. *Harris* (1977) 65 Cal.App.3d 978, 987 [135 Cal.Rptr. 668].) ■ The defendant, however, urges this court to find

that the court below failed to exercise its discretion in denying him cocounsel status, which would entitle him to reversal per se. (*People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994].)

The defendant is attempting to construe the trial court's decision to deny the motion for cocounsel status as a Hobson's choice. Defendant either submits to inadequate cross-examination of a key prosecution witness, or he elects to become his own counsel. Either way Hutton loses an important element of his representation. If the defendant represents himself to cross-examine McDaniel, he loses the full services of an attorney for the remainder of the trial. The defendant would then relinquish the expertise of an accomplished litigator to examine and cross-examine future witnesses, prepare jury instructions, shift strategy in trial tactics where necessary, and to make closing arguments. If Hutton chooses instead to allow Adams to cross-examine McDaniel, he potentially loses a key opportunity to exonerate himself of the grand theft charges.

Contrary to the defendant's argument, *People* v. *Bigelow, supra,* does not give all criminal defendants a right to per se reversal of all cases in which motions for cocounsel are denied. In relevant part the *Bigelow* decision holds as follows: ". . . for Bigelow had no absolute right to advisory counsel (see *People* v. *Mattson, supra,* 51 Cal.2d 777, 795-796), but only to a considered exercise of judicial discretion. A second reason for a rule of per se reversal, however, applies fully in the present setting: the impossibility of assessing the effect of the absence of counsel upon the presentation of the case." (37 Cal.3d at pp. 744-745.) Thus, a criminal defendant is entitled only to the considered exercise of judicial discretion not to an absolute right of reversal when his motion for cocounsel status is denied by the court.

Hutton argues that the trial court made references indicating that the defendant could defend himself or be represented by counsel but that he could not be represented by himself and Adams at the same time. Although the trial court's comments are cryptic, defendant's characterization is inaccurate. The trial court specifically acknowledged that it could "conjure up a case . . . where a defendant might be appointed cocounsel, but this was not one."

*People* v. *Davis* (1984) 161 Cal.App.3d 796 [207 Cal.Rptr. 846] held that a defendant with special expertise was entitled to cross-examine a witness at a preliminary hearing. The magistrate's failure to allow the attorney-defendant (who was, unlike appointed counsel, prepared for cross-examination of the witness) to cross-examine a witness justified granting a motion setting aside the information. In *Davis,* however, the record was clear that the magistrate was unaware that he had the discretion to allow a

criminal defendant the opportunity to cross-examine a witness. (161 Cal.App.3d at p. 802.)

Following *People* v. *Mattson* (1959) 51 Cal.2d 777 [336 P.2d 937], the *Davis* court reasoned that: "A defendant neither has an absolute right to participate in the presentation of his case when he is represented by counsel nor an absolute right to the assistance of counsel when he is proceeding pro. per. [Citations.] As the *Mattson* court stated: 'These matters are within the sound discretion of the trial judge who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt, and just disposition of the cause.

"'The court, however, should not permit a litigant both to have counsel and to actively participate in the conduct of the case . . . *unless the court on a substantial showing determines that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered or delayed.*' (*People* v. *Mattson, supra,* 51 Cal.2d at p. 797, italics added.)" (161 Cal.App.3d at pp. 801-802; fn. omitted.)

Unlike the magistrate in the *Davis* case, the trial court here recognized that the potential for cocounsel status existed. The court specifically took a recess after conducting the *Faretta* hearing to review the case authority before finalizing its ruling. Defendant received a "considered exercise of judicial discretion."

Other differences distinguish *Davis* from the instant case. In *Davis,* defense counsel was unprepared and the defendant was an experienced attorney intimately familiar with the facts of his own case. Here, defense counsel was very well prepared. The trial court could not find enough praise for the quality of Adams's defense.

Both *Mattson* and *Davis,* as quoted above, require a "substantial showing" before a criminal defendant can serve as cocounsel in an action. The image of an accomplished litigator unable to comprehend basic accounting and bookkeeping is captivating. Although the existence of such a person is improbable, it is certainly not impossible. The only showing made here, however, is that counsel could not understand accounting or defendant's explanation of a defense based on accounting procedures.

Unlike *Davis,* the instant record does not substantiate defendant's or Adams's assertion that counsel could not understand accounting or bookkeeping. Adams appeared to have no problem zealously protecting Mr. Hutton throughout Sharon Moore's entire testimony and the direct exami-

nation of McDaniel. Each of these witnesses' testimony was parallel concerning the introduction of daily cash reports and deposit slips showing that cash deposits were missing from deposits made on the days that the defendant took the deposits to the bank.

The district attorney, the defendant and the trial judge all agreed that the bookkeeping procedures were, in fact, *simple*. The defendant's main contention at trial was that the identification codes for various transactions were not easily grasped. This is hardly a "substantial showing" of necessity. It is telling that, in his initial representation to the court, Adams failed to explain how he misunderstood McDaniel's or Sharon Moore's testimony regarding the use of daily cash reports and deposit slips. Although Mr. Adams states that he does not understand the accounting and bookkeeping procedures used at Woody's Toy Circus, he fails to identify specifically those areas in which he is confused. Perhaps Adams was confused at the alleged complexity of Hutton's defense based on toy store bookkeeping procedures because the defendant's theory was in fact too far fetched to comprehend.

The defense failed to meet its burden of a "substantial showing" of necessity for the appointment of defendant as cocounsel. The trial court carefully exercised its discretion before finally denying the motion. But even if error could be assigned to the trial court for failing to grant the motion, such error would be harmless in light of the record of defendant's cross-examination of McDaniel.

Defendant was granted his *Faretta* motion. There is not one question in defendant's cross-examination that could even remotely be construed as a complex bookkeeping or accounting matter. The identification codes that the defendant complained about as being too complex were broken down as: (1) P and L for profit and loss; (2) NF for nonsufficient funds; (3) CO for check override; and (4) RI for returned item.

The defendant attempted to develop a theory that the downtown toy store was in such financial ruin that Bryant had the clearest motive to burn down the store. Defendant tried to show through McDaniel that cash overrides were paid by the bank because of the toy store's money problems. On redirect examination McDaniel testified that defendant caused the check overrides because he failed to cover outgoing checks.

Defendant's cross-examination of McDaniel was routine. Very little of . her testimony concerned accounting or bookkeeping procedures. There was nothing in the record that any trial counsel as competent as Adams would fail to grasp.

Defendant's attempt to make the trial court's ruling appear as a Hobson's choice is not supported by the record. The defendant was given one important alternative to representing himself after the court denied the cocounsel motion. The trial court offered to continue the cross-examination of McDaniel on two separate occasions to allow the defense more time to prepare. The defendant had the additional right to consult with Adams during counsel's cross-examination of the witness. Defendant had alternatives other than representing himself to assure a meaningful cross-examination of a key prosecution witness.

## II.

### PROSECUTORIAL MISCONDUCT.

As evidence of substantial prejudice to the defendant from denial of his cocounsel motion, he cites four incidences of prosecutorial misconduct. The first was an improper reference on cross-examination of defendant to a newspaper article already excluded by the court from evidence. The other three were improper comments by the prosecution in his closing arguments.

■ The test applied in cases of alleged prosecutorial misconduct is set forth as follows in *People* v. *Green* (1980) 27 Cal.3d 1 at page 34 [164 Cal.Rptr. 1, 609 P.2d 468]: "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected (see, e.g., *People* v. *Nicolaus* (1967) *supra,* 65 Cal.2d 866, 881 [56 Cal.Rptr. 635, 423 P.2d 787]); if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution. [Citations.]" (See also *People* v. *Granados* (1957) 49 Cal.2d 490, 495 [319 P.2d 346].)

The defendant completely failed to object to any of the four moments of alleged prosecutorial misconduct. *Green* sets forth a two-pronged test for measuring potential error. If timely objection and admonition would have cured the harm, the challenge must be denied. Only when an admonition would not cure the error must the court review the record as a whole to determine whether a miscarriage of justice has occurred.

■ The first instance involving reference to a newspaper article is arguably not even objectionable. On cross-examination the prosecution was attempting to impeach the defendant with prior inconsistent statements and admissions made to a newspaper reporter after the fire. The trial court ruled that no reference could be made to the article itself, but that conversation

with the reporter was admissible. The alleged error is so small that it would have been cured with an admonition.

The prosecutor's comments in his closing remarks involved references to bad acts by Hutton to his girlfriend that were clearly collateral and a reference to the defendant as being cocky enough to think that he could get away with the crime. The second comment related to the prosecution's efforts to show the defendant's motive in committing the crimes and is not even objectionable. Certainly an admonition would have cured any error as to the second comment.

Specific instances of bad conduct as to matters collateral to the main action are usually not admissible. (*People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 461 [161 Cal.Rptr. 634].) Particular instances of untruthfulness cannot be used to prove bad character. (*People* v. *Martin* (1983) 150 Cal.App.3d 148, 160 [197 Cal.Rptr. 655].)

The reference the prosecution made to defendant taking advantage of his girlfriend, Notaro, were related to $3,000 she loaned defendant. In an apparent attempt to explain how he had $10,000 in a paper bag in his closet at the time of his arrest, the defendant asked Notaro whether she ever loaned him $3,000 and whether it had ever been repaid. Notaro responded that she had made the loan and that it had not been repaid. When asked by the prosecutor on cross-examination what defendant did with the $3,000, he stated that he put the money into a savings. When asked why he put borrowed money into savings, the defendant admitted that he never intended to pay it back because of all the expenses he had previously paid for Notaro. Defendant further admitted that although Notaro thought she was loaning the money, he planned to keep it for payment for past debts.

It was defendant who opened the door to the issue of the $3,000 "loan" through his direct examination of Notaro. During his own direct testimony, defendant denied telling a fire captain that the money discovered by the search of his apartment after the fire was a gift from Notaro's mother. Defendant then admitted on his direct testimony that he hid the money from Notaro because of a rift in their relationship. The prosecutor's cross-examination of the defendant concerning the $3,000 loan is justified to contradict facts elicited on direct examination of a witness. (*People* v. *Zerillo* (1950) 36 Cal.2d 222, 229 [223 P.2d 223]; *People* v. *Bigelow* (1951) 104 Cal.App.2d 380, 387.)

More importantly, defendant's admission on cross-examination that he failed to tell Notaro that he intended never to repay the "loan" is evidence of honesty or its opposite. Such evidence is admissible to attack credibility

as a concession of untruthfulness. (*People* v. *Thompson* (1979) 98 Cal.App.3d 467, 476 [159 Cal.Rptr. 615]; Evid. Code, § 780, subd. (k).) Thus, the prosecutor committed no error in his closing remarks. Any error that could conceivably have been committed would have been cured through admonitions after appropriate objections from the defendant.

 Even reaching the issue of whether the record as a whole shows a miscarriage of justice pursuant to the second prong of *Green*, there has been no such showing in the instant action. *People* v. *Bigelow, supra,* 37 Cal.3d 731 adopted a rule of per se reversal not only because the trial court failed to exercise its discretion in ruling on a motion for appointment of advisory counsel, but also because the record as a whole showed that Bigelow was completely incompetent as his own attorney. The *Bigelow* case was also a capital action. Unlike the instant case, the *Bigelow* court found that the record was devoid of what competent counsel might have accomplished for the capital defendant. The *Bigelow* court reasoned as follows: "What we know from the record is that Bigelow, representing himself, proved totally incompetent as a defense attorney, and that this trial of a capital case could rightly be described as a '"farce or a sham."' [Citation omitted.] What we do know is whether Bigelow, aided by advisory counsel, would have done any better. The most we could do would be to identify points in the trial where competent counsel might have advised Bigelow to do something different, wonder whether Bigelow would follow the advice, and speculate about the impact of the advice on the outcome of the trial. Even that effort would not disclose the possibility that counsel might advise Bigelow to seek out evidence and witnesses which do not appear in the present record. Trying to assess prejudice in this setting would amount to 'speculation running riot.' [Citation omitted.] A rule of per se reversal is *the only way to protect the right of defendant to a conscientious exercise* of judicial discretion on the appointment of advisory counsel, and to vindicate the state's independent interest in the fairness and accuracy of a capital proceeding. [Citation omitted.]" (37 Cal.3d at pp. 745-746.)

 Although a careful review of the record reveals that defendant was not as effective as his appointed counsel, once a *Faretta* motion is properly granted, the defendant must suffer the consequences of self-representation. (*Faretta* v. *California, supra,* 422 U.S. 806, 835, at fn. 46 [45 L.Ed.2d 562, 581].)

 Defendant did a reasonably competent job of cross-examining prosecution witnesses and of calling his own witnesses. His closing arguments were impassioned and convincing. Unlike Bigelow, defendant secured an acquittal on the arson charges against him. In summary, there has been no showing of a miscarriage of justice pursuant to *Green* or a reason for

per se reversal pursuant to *Bigelow*. Defendant's appeal on the failure of the trial court to grant his motion for cocounsel and on alleged acts of prosecutorial misconduct is rejected.

### III.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . .

### DECISION

The judgment is affirmed.

Martin, Acting P. J., and Hamlin, J., concurred.

---

*See footnote on page 934, *ante*.