Filed 3/3/16  P. v. Gomez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>YOCIO JONATHAN GOMEZ,<br><br>    Defendant and Appellant. | B258302<br><br>(Los Angeles County<br>Super. Ct. No. YA085001) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge.  Affirmed with directions.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stacy S. Schwartz, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Early in the morning of July 23, 2012, after an evening of drinking and partying, Yocio Jonathan Gomez (Gomez) drove his vehicle near a construction zone on the 405 freeway and triggered a chain reaction accident which killed two construction workers and severely injured a third. A jury convicted Gomez of murder, gross vehicular manslaughter, and driving under the influence of alcohol and causing injury. On appeal, Gomez raises four issues. We affirm on three of the four issues: the trial court's denial of Gomez's *Batson/Wheeler*[1] motion, the trial court's exclusion of evidence on a third party's purported contributory negligence, and the trial court's reading of the CALJIC No. 250 jury instruction on general intent. However, on the fourth issue, the legal adequacy of the abstract of judgment, we remand for the trial court to prepare an amended abstract that identifies the statutory basis for each monetary fine and penalty imposed.

## BACKGROUND

I. **Facts of the case**

A. *Prior convictions*

Before the incident in this case, Gomez had two convictions for driving under the influence (DUI). The first DUI offense occurred on June 1, 2008; on June 2, the People, via a complaint, charged Gomez with driving under the influence in violation of Vehicle Code section 23152, subdivision (b)[2] in case no. 8LT04158. He pleaded no contest, and the court placed Gomez on summary probation for 60 days and ordered him to pay a $390 fine or serve 13 days in Los Angeles County jail. The date of conviction was July 14, 2008.

The second DUI offense occurred less than a year later, on April 6, 2009. In case no. 9LT04101 filed on April 7, the People's complaint charged Gomez with driving

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] All further statutory references are to the Vehicle Code unless otherwise indicated.

under the influence under section 23152, subdivision (b). He again pleaded no contest, and the court suspended Gomez's driver's license, placed him on probation for five years, and ordered him to pay a fine and serve 30 days in Los Angeles County jail. The date of conviction was April 14, 2009.

Gomez still had a suspended license and remained on probation for his second DUI offense when the July 23, 2012 incident, described below, occurred.

### B.    *The incident*

On July 22, 2012, between 8:00 p.m. and 8:30 p.m., Gomez arrived at a party at a friend's apartment. While at the party, Gomez consumed an unknown quantity of alcohol. Later in the night, because Gomez appeared inebriated, the host attempted to stop Gomez from drinking even more alcohol. According to his testimony at trial, the host successfully stopped Gomez from drinking more alcohol. Around 1:00 a.m., Gomez expressed that he wanted to leave the party soon because he had to work in a few hours, but because Gomez still appeared inebriated the host tried to stop him from driving. Though the host offered to let Gomez spend the night at the apartment instead of driving home, Gomez refused. Between 2:00 a.m. and 2:30 a.m., when the host went to the bathroom, Gomez snuck out and drove away in his car.

On that night, the northbound 405 freeway had several closed lanes due to active construction near the Artesia Boulevard exit. As drivers approached the construction zone, hundreds of traffic cones with two reflective stripes, arrow boards displaying messages such as "move over" and "road work ahead," and warning lights alerted them to the upcoming construction zone. While the posted speed limit in this section of the freeway is 65 miles per hour during regular conditions, it is unclear whether there were signs requiring a reduced speed limit due to the construction zone.

Driving 92 miles per hour next to the construction zone, Gomez straddled the carpool lane and first lane (the two lanes closest to the median) in his Ford Explorer, and the right front of his car struck the left rear of another car, a Lexus RX 350 (second car). The second car spun out of control into the construction area; the car hit a construction worker, trapping him upside down inside a drill machine, and catapulted a second

3

construction worker over the guardrail. Both construction workers died from their injuries. The second car's impact threw a third construction worker against the guardrail; he survived but suffered permanent injuries.

An accident reconstruction expert testified at trial that Gomez's pre-impact speed of 92 miles per hour was "excessive" and in violation of sections 22350 and 22349, subdivision (a).[3] Gomez had not been braking when he hit the second car. The expert further opined that at the instant before Gomez's car impacted the second car, the second car's speed was 47 miles per hour. After Gomez's car struck the second car, according to the expert, the second car's driver had no means to regain control of his car. Based on Gomez's "egregious speed," the impact sending the second car "out of control," and the fact that the second car was fully within its lane while Gomez's car "was traveling between two lanes, colliding with the other vehicle," the expert concluded that Gomez— and Gomez alone—caused the collision.

At trial, eyewitness Tiara B. testified that, while driving on the freeway with two cars ahead of her, she saw Gomez's car quickly approach her from behind. As Gomez's car approached hazardously close to her car, she swerved out of the way to avoid an accident. She observed Gomez's car pass the first car directly in front of her but strike the second car in front of her. Then, the second car spun out of control into the construction area, and Gomez's car flipped over and slid along the freeway. Tiara B. called the police to report the collision and its location.

A second eyewitness George Z., a construction worker on-site, saw Gomez's car slide on its roof along the freeway. When he approached Gomez's car, he smelled

---

[3] Section 22350 is the "[b]asic speed law" and mandates the following: "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property." Section 22349, subdivision (a) is the "[m]aximum speed limit" provision and recites as follows: "Except as provided in Section 22356, no person may drive a vehicle upon a highway at a speed greater than 65 miles per hour."

alcohol and observed an alcoholic beverage on the ground about 10 feet away from Gomez's car.

California Highway Patrol Officer Jimmy Nguy responded to the police call. He observed Gomez exit the overturned car. Approaching Gomez, Officer Nguy smelled a strong odor of alcohol and noticed slurring in Gomez's speech. Another Spanish-speaking officer, Officer Jose Cheak, who had arrived at the scene before Officer Nguy, acted as a translator between Officer Nguy and Gomez; Officer Cheak confirmed that Gomez spoke incoherently. After Gomez gave Officer Nguy his identification card, Gomez vomited on his own shoes. Yet, Gomez denied to the police officers that he had consumed any alcohol that night.

After performing multiple field sobriety tests on Gomez and concluding that Gomez had been driving under the influence of alcohol, Officer Nguy arrested him. The criminalist at trial testified that a blood alcohol level (BAL) over 0.08 percent impairs a driver's ability "to drive safely." She opined that Gomez's BAL was likely 0.23 percent at the time of the collision.

The next day, at the county jail, Gomez admitted that during the incident "it's clear that I was smashed, drunk."

## II.    Procedural history

An amended information charged Gomez with murder under Penal Code section 187, subdivision (a) (counts 1 and 2), gross vehicular manslaughter while intoxicated under Penal Code section 191.5, subdivision (a) (counts 3 and 4), and driving under the influence and causing injury under Vehicle Code section 23153, subdivisions (a) and (b) (counts 5 and 6). The information also alleged that Gomez had two prior convictions for driving under the influence of alcohol, as discussed above. The first conviction concerned the DUI offense on June 1, 2008, with a conviction date of July 14, 2008, in case no. 8LT04158. The second DUI occurred on April 6, 2009 and led to a conviction in case no. 9LT04101 on April 14, 2009.

Gomez pleaded not guilty to the charges, denied the allegations on the prior convictions, and presented no evidence on his own behalf at trial. The jury found Gomez

5

guilty of murder in the second degree (counts 1 and 2), gross vehicular manslaughter while intoxicated (counts 3 and 4), and driving under the influence and causing injury (counts 5 and 6), and found true the allegations that Gomez had the two prior DUI convictions. The trial court sentenced Gomez to consecutive terms of 15 years to life each on counts 1 and 2 as well as an upper term of four years on count 5. The trial court imposed the following monetary fines and penalties: "a fine of $390.00 plus a state penalty fund assessment of $1,131.00 for a total of $1,521.00."

## DISCUSSION

### I.    The trial court correctly denied Gomez's *Batson/Wheeler* motion.

During voir dire, Gomez's counsel orally made a *Batson*/*Wheeler* motion, based on the prosecutor excusing two of the four Hispanic prospective jurors in the jury pool, Prospective Jurors Nos. 6159 and 6204. When the trial court asked whether the prosecutor wanted to respond to the motion, the prosecutor said only if the court first finds the defense has shown a prima facie case of discrimination. After concluding that the defense had not met its initial burden, the trial court on its own initiative provided race-neutral reasons for the peremptory challenge to Prospective Juror No. 6159 and denied the defense's *Batson*/*Wheeler* motion entirely.

A juror's race cannot be the sole basis for a peremptory challenge. When a defendant makes a *Batson/Wheeler* motion challenging a prosecutor's peremptory challenge as impermissibly based on race, courts proceed through a three-step procedure. First, the defendant has the burden of showing a prima facie case of discrimination. Second, only if the defendant successfully makes that showing, the burden shifts to the prosecutor to offer a race-neutral justification for the peremptory challenges. Third, only if the prosecutor successfully makes that offering, the trial court decides whether the defendant has met its burden to show purposeful racial discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168 [125 S.Ct. 2410, 2416, 162 L.Ed.2d 129, 138].)

Both parties agree our review in this case begins at step one: whether Gomez has met his burden of showing a prima facie case of discrimination. Gomez "must make out

6

a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson v. California*, *supra*, 545 U.S. at p. 168.)

On appeal, Gomez argues that because the prosecutor dismissed two of the four jurors with Hispanic-sounding names, he has sufficiently established a prima facie case of discrimination. Gomez argues that the peremptory challenges amount to 50 percent of the potential Hispanic jurors, which is "statistical data" showing discrimination.

The California Supreme Court, however, has repeatedly held that peremptory challenges of only two jurors of the same race can "rarely" suggest a pattern of impermissible exclusion and that it is "impossible" to infer discrimination from such a small sample size. For example, in *People v. Bonilla* (2007) 41 Cal.4th 313, the prospective juror pool contained only two African-Americans, and the prosecutor excused both with peremptory challenges. (*Id.* at pp. 342–343.) The defense's *Batson/Wheeler* motion relied principally on the fact that the prosecutor had dismissed all members of the racial group—two of two, or 100 percent. (*Id.* at p. 342.) Yet, the Supreme Court held that because the number of disputed jurors excused was only two, "'the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible.'" (*Id.* at p. 343; see *People v. Harris* (2013) 57 Cal.4th 804, 835; *People v. Bell* (2007) 40 Cal.4th 582, 597–598.) While Gomez focuses upon the percentage of the prospective juror pool excused, that information lacks statistical significance in light of the small sample size. As the absolute number of jurors excused is only two, this data is an inadequate basis for a statistical analysis of whether the peremptory challenges had a discriminatory purpose.

Other facts also support the trial court's determination in this case. The trial court on its own initiative found race-neutral reasons for the peremptory challenge of Prospective Juror No. 6159. The trial court found it necessary to read every question to the juror; and while Gomez argues that the juror could not see very well, the trial court also found that the juror did not understand the questions asked. The trial court further observed the juror's body language and assessed the juror as "slow" and awkward in answering questions. In *People v. Taylor* (2009) 47 Cal.4th 850, a prospective juror

7

"'was clearly confused'" and had answers "'all over the board,'" and the trial court had "'concern[ ] that she would be unable to understand and follow the directions of the court'"; the California Supreme Court held that the prosecutor had a non-discriminatory reason for excusing that juror. (*Id.* at p. 893.) "Whether due to anxiety, limited literacy, poor verbal comprehension or other factors," the juror displayed "great difficulty understanding the written and oral questioning" and thus "gave strong reason to doubt her ability to perform her duties as a juror." (*Ibid.*) The same holding applies here.

Gomez's counsel referred to the other excused juror at issue, Prospective Juror No. 6204, as "the man who worked for the Hispanic media."[4] There was a potential that the juror's employment at a relevant media outlet would expose him unintentionally to outside information concerning the case. In *People v. Jenkins* (2000) 22 Cal.4th 900, the California Supreme Court held that because a juror "anticipated some difficulty in the course of trial shielding himself from outside information concerning the case because of his employment as a reporter with a local newspaper," the record amply supported the conclusion that the prosecutor did not challenge the prospective African-American juror based solely on race. (*Id.* at p. 994.) In addition, Prospective Juror No. 6204 had investigated "numerous stories" similar to this case. Because "jurors who have so much interest, education, and experience in the same field as the anticipated testimony . . . are likely to have established views and predispositions regarding the testimony, which they might share with the other jurors," our Supreme Court has similarly approved as race-neutral a prosecutor's peremptory challenge to a prospective juror due to his "educational background, interest, and experience in the field." (*People v. DeHoyos* (2013) 57 Cal.4th

---

[4] After finding Gomez had not shown a prima facie case of discrimination, there was no requirement that the trial court provide on the record any race-neutral reason for the peremptory challenge. On appeal, having rejected Gomez's argument for a prima facie case of discrimination based solely on the percentage of jurors excused, there also is no requirement that we look for race-neutral reasons, but we nevertheless have reviewed independently the record and found several race-neutral reasons for the peremptory challenge to Prospective Juror No. 6204.

79, 110–111.)  Thus, the record of Prospective Juror No. 6204's voir dire also supports race-neutral reasons for the peremptory challenge excusing him.

Gomez asks us to conduct for the first time on appeal a comparative analysis of whether the prosecutor's stated reasons for excusing these two jurors applies equally to other jurors that the prosecutor did not excuse.  "When a trial court has found no prima facie showing, and the prosecutor has declined to state reasons for the excusals, we have declined to conduct a comparative juror analysis." (*People v. Harris*, *supra*, 57 Cal.4th at p. 836.)  In this case, the trial court did not find a prima facie showing.  Further, the prosecutor had neither the opportunity before the trial court to provide all of his race-neutral reasons for excusing these two jurors nor the opportunity to explain the differences he perceived between the excused jurors and the non-excused jurors.  The record is inadequate for us to engage in a meaningful comparative analysis of the jurors' answers, and we thus decline Gomez's request.

Because we agree with the trial court that Gomez failed to meet his burden under step one, our analysis can end here.

## II.     The trial court did not abuse its discretion in excluding evidence on purported contributory negligence.

We review a trial court's ruling on the relevance, admission, or exclusion of evidence under the abuse of discretion standard.  (*People v. Harrison* (2005) 35 Cal.4th 208, 230.)  We reverse only if the trial court's ruling is in an """"arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."""" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)

The evidence at issue concerns the purported contributory negligence of the second car driver, including his blood alcohol content, testimony by witnesses on whether he appeared to be under the influence of alcohol, and whether he was the cause or a contributory cause of the collision.  Arguing that evidence of a third party's contributory negligence is irrelevant to the defendant's guilt for criminal charges under criminal law, the prosecution moved in limine to preclude the defense from introducing this evidence at trial.  The defense contended that the disputed evidence affects the second car driver's

9

"credibility as a witness" in testifying against Gomez;[5] the defense also argued that because the second car driver "was also initially arrested" he has "an inherent bias and motive to fabricate." Agreeing with the prosecution, the trial court held that Gomez's actions were a substantial factor in causing the deaths in this case, the second car driver's actions did not break the chain of causation, and therefore the disputed evidence was irrelevant; the trial court granted the prosecution motion to exclude the evidence from trial.

Contributory negligence is not a defense or excuse for a crime. (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46.) That a third party may have shared responsibility or fault, even if that conduct is a crime itself, "does nothing to exonerate defendant for his role." (*Id*. at p. 51.) We "cannot permit a defendant to escape responsibility for his or her criminal conduct simply because a victim was not 'sufficiently' cautious or perfect." (*People v. Wattier* (1996) 51 Cal.App.4th 948, 954.) "Facts attacking legal causation are only relevant if the defendant's act was *not* a substantial factor" such that the third party's conduct was the sole or "superseding cause." (*Id.* at p. 953.) A sole or superseding cause is conduct "so unusual, abnormal, or extraordinary that it could not have been foreseen." (*Schmies*, at p. 52.)

Gomez argues it is unforeseeable that the second car driver would be driving "so slow" and thus the car collision and subsequent deaths "would not have occurred" absent the second car's speed of 47 miles per hour and the driver's alleged drinking. First, Gomez concedes that it is foreseeable that his own illegally high speed (92 miles per hour) and BAL (0.23 percent) would cause a car collision. Second, in light of the posted speed limit of 65 miles per hour and the presence of the construction zone, which ordinarily requires a reduced speed, 47 miles per hour is not an "unusually" slow speed in this case. Thus, it is also foreseeable that other drivers on the freeway would drive at a slower speed than the posted speed limit, such as 47 miles per hour. In arguing that the

---

[5] At trial, neither party offered the second car driver to testify as a witness.

10

car collision would not have occurred absent the second car driver's *slower* speed, Gomez speculatively implies that if the second car had been moving at a *faster* speed then the collision would not have occurred. He provides no analytical support for his conclusion. Third, the accident reconstruction expert opined that once Gomez's car hit the second car, the second car driver was helpless to regain control of his car.

Therefore, Gomez's actions, including his intoxication, high driving speed, and erratic lane changing, were substantial factors causing the car collision and subsequent deaths. The speed and condition of the second car driver was not the sole or superseding cause of the car collision and subsequent deaths, and did not break the chain of causation. The trial court did not abuse its discretion in excluding this evidence on purported contributory negligence.

**III.    Though the trial court erred in reading the CALJIC No. 250 jury instruction to the jury, that error was harmless.**

Gomez faced charges of murder and gross vehicular manslaughter while intoxicated. Neither is a general intent crime. (Pen. Code, §§ 187, 191.5.) When discussing the general concept of union of act and intent before instructing on any specific charge in this case, however, the trial court provided the instruction on general intent, CALJIC No. 250.

The trial court read CALJIC No. 250 as follows: "The crimes charged in this case require the proof—or proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crimes of murder as alleged in counts 1 and 2, gross vehicular manslaughter while intoxicated as alleged in counts 3 and 4, D.U.I., driving under the influence, causing injury with two or more priors as alleged in count 5, and D.U.I. over .08 percent alcohol causing injury as alleged in count 6, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime."

11

The trial court erred in providing that instruction to the jury. Instead, in light of the murder charge, the trial court should have provided the generic instruction on specific intent, CALJIC No. 251; and, due to the gross vehicular manslaughter while intoxicated charge, the trial court should have provided the generic instruction on criminal negligence, CALJIC No. 253.

Nevertheless, when instructing on the elements of each specific crime charged, the trial court did explain in detail the required intent for each crime: *malice* for murder with malice aforethought in CALJIC No. 520 and *gross negligence* for gross vehicular manslaughter while intoxicated in CALJIC No. 590.

For malice, the trial court read CALJIC No. 520 to the jury as follows: "The defendant is charged in counts 1 and 2 with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] and [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] and [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. . . ."

The trial court also read the following to the jury on gross negligence, which complies with CALJIC No. 590: "The defendant is charged in counts 3 and 4 with gross vehicular manslaughter while intoxicated in violation of Penal Code section 195.5 subsection (a). [¶] To prove that the defendant is guilty of this crime, the People must prove: [¶] 1. The defendant drove under the influence of an alcoholic beverage or drove

12

while having a blood alcohol level 0.08 or higher; [¶] 2. While driving that vehicle under the influence of an alcoholic beverage, the defendant also committed an infraction; [¶] 3. The defendant committed the infraction with gross negligence; [¶] and [¶] 4. The defendant grossly—the defendant's [sic] grossly negligent conduct caused the death of another person. [¶] . . . [¶] Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] and [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different than the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] The combination of driving a vehicle while under the influence of an alcoholic beverage and violating a traffic law is not enough by itself to establish gross negligence. In evaluating whether the defendant acted with gross negligence, consider the level of the defendant's intoxication, if any; the way the defendant drove; and any other relevant aspects of the defendant's conduct."

Gomez argues that because the jury instructions were "conflicting and affirmatively misleading," this error was not harmless. Under our precedent, however, we determine that the jury could not have misunderstood the intent required for each specific crime merely because of the addition of the generic general intent instruction. (*People v. Zerillo* (1950) 36 Cal.2d 222, 232; *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1462–1463.) Here, the jury instructions on each specific crime correctly described in great detail the required intent. Those instructions unambiguously tell the jury that for conviction Gomez must have had malice and gross negligence, respectively, and explained what those terms meant. The trial court's error in reading the CALJIC No. 250 instruction to the jury was harmless.

13

**IV.    On remand, the trial must provide an amended abstract of judgment that specifies the statutory basis for each monetary fine and penalty.**

The abstract of judgment must contain the amount and statutory basis for each fine and penalty.  (*People v. Johnson* (2015) 234 Cal.App.4th 1432, 1459; *People v. Hamed* (2013) 221 Cal.App.4th 928, 940.)  We have held that such detail has dual purposes: allowing the parties an opportunity to identify and correct any errors in the trial court to avoid unnecessary appeals and assisting the Department of Corrections and Rehabilitation to fulfill its statutory duty to collect and forward deductions to the appropriate agency.  (*Hamed*, at pp. 939–940.)  Here, the abstract merely recites the amount of the fine and penalty without the statutory basis for each fine and penalty:  "Pay a fine of $390.00 plus a state penalty fund assessment of $1,131.00 for a total of $1,521.00."  Therefore, we remand for the trial court to correct the abstract by including the statutory basis for each fine and penalty.

**DISPOSITION**

We direct the trial court to correct the abstract of judgment to reflect the statutory basis for each fine and penalty and to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.